[Civ. No. 5879. Third Appellate District.—February 5, 1938.]

ALEXANDRINO MONIZ, as Administrator, etc., Respondent, v. J. M. BETTENCOURT et al., Appellants.

[Civ. No. 5880. Third Appellate District.—February 5, 1938.]

ALEXANDRINO MONIZ et al., Respondents, v. J. M. BETTENCOURT et al., Appellants.

Hawkins & Hawkins, G. W. Hawkins and H. K. Landram for Appellants.

F. M. Ostrander and D. Oliver Germino for Respondents.

PULLEN, P. J.—This appeal is from two judgments based upon verdicts rendered by a jury empaneled to try the two cases which were consolidated for that purpose. Both cases arose out of the same automobile accident.

In the case of Moniz, as administrator of the estate of Edith Moniz, deceased, against the appellants, the administrator sought to recover damages upon behalf of the heirs of Edith Moniz.

In the second case Moniz sued in his own right, and as guardian *ad litem* for his two minor sons. After a trial by jury a verdict was rendered in the action by Moniz, as administrator, in the sum of $16,555, and in the second action returned a verdict for Alexandrino Moniz in the sum of

$10,000; for Chester Moniz, $5,000, and for Anthony Moniz, $180. These judgments were against all of the defendants, including J. M. Bettencourt.

The facts out of which these actions arose are as follows:

About 11 o'clock in the evening of July 1, 1936, LaVerne Mendonca, one of the defendants herein, was an employee of E. Guy Warren, doing business under the name of Bettencourt & Warren. At that time Mendonca was driving a semi-trailer, north on the highway between Los Banos and Gustine. The truck was owned by Bettencourt but was being operated under lease to Warren. The highway was a part of the state system and was paved with a sixteen-foot strip of concrete with shoulders two or three feet wide on each side of the concrete, with a white stripe down the center of the concrete slab.

Respondent Moniz, his wife and two children were, at that time and place riding as guests of Joe V. Coehlo, in an automobile driven by Coehlo, southerly along said highway. The automobile and truck met upon the highway, and after passing the front end of the truck the two vehicles collided, the point of impact being some sixteen feet back of the front portion of the trailer. As a result of this collision, all of the occupants of the automobile, some eight in number, were either killed or injured.

The truck was of a type known as a semitrailer. The motive unit had two front wheels to which was attached the steering apparatus. It was driven by dual wheels corresponding to the rear wheels of an automobile. Between these drive wheels was a pivot, upon which rested the front part of the body of the trailer. The rear end of this body was supported by two pair of dual wheels. The truck was somewhat less than thirty-three feet in length and the tractor portion of the trailer was approximately fifteen feet long. It was seventy-two inches between the outer edges of the two front wheels and eighty-seven inches between the outer edges of the dual drivers. The bed of the trailer was approximately ninety-six inches in width.

The Studebaker first struck the semitrailer at an angle ahead of the driving duals, forcing those wheels back so they rubbed upon the spring. It then continued on and struck just in front of the two rear dual wheels on the rear of the trailer, forcing them out of line.

At the time of the accident the truck was loaded with sacked wheat, some of which were torn open by the impact,

and the wheat strewn over the roadway. Marks were found upon the highway where the wheels of the trailer had run over the wheat leaving white marks upon the concrete, which were later referred to by the various witnesses in fixing the point of impact. These white marks commenced at a point about sixteen inches west of the center line of the highway, and ran northeasterly some eighty feet to a point near the east side of the road, where the truck came to rest.

The driver of the Studebaker was dead at the time of the trial, but Domingos Coehlo, his brother, testified he was sitting in the front seat beside his brother, and that he observed that the driver of the Studebaker was on the proper side of the highway as indicated by the white line, but he could not say how far. He saw the truck approaching and thought the Studebaker passed the fender and came in contact with the body of the truck. At the time of the collision, he testified, the Studebaker was traveling about thirty-five or forty miles an hour. Other passengers in the car testified to the same effect.

Officer Nicholson, of the state highway police, described the highway at the point of the collision, and testified the driver of the truck admitted to him that the inner duals on the left side of his truck were on the white line; and that the inner duals were in line with the center of the front tires before the accident. The statement of the driver of the truck was also taken by the district attorney, to whom he stated that he had all of his wheels on the highway, the front wheels inside of the white line, and as to the dual wheels, one was on one side of the line and one on the other side. He also testified that he saw the Studebaker approaching, and also saw a milk truck about to enter the highway from a side road; he did not pull over to the right when he saw the Studebaker approaching because at that instant he had his eyes on the milk truck about to enter the highway, and before he could change his course, the collision occurred.

This driver and truck left Hayward about 4 o'clock in the afternoon preceding the accident with a load which he delivered at Coalinga the next morning; he unloaded at Coalinga and then took on a load of grain and drove to Firebaugh. He left Firebaugh just before dark on the evening of the accident, stopping in Los Banos for fuel. The driver had not removed his clothes since leaving Hayward, and his

rest consisted of periods when he would stop along the highway for that purpose.

In support of the contention of appellants that the court erred in the judgments rendered, they allege first, that the liability of an owner for imputed negligence under section 402b of the Vehicle Code is limited to $5,000 for the death or injury for one person in any one accident, and $10,000 for more than one person. Respondents concede this, and that the judgments in these cases against J. M. Bettencourt should be limited, in the case of Moniz, as administrator, to the sum of $5,000, and in the second case to the sum of $5,000, and accordingly the judgments must be reduced to those amounts as against Bettencourt.

It is next urged the trial court erred in permitting plaintiffs to prove that an insurance company was interested in the case. Upon *voir dire,* seven of the prospective jury were asked whether they were interested financially in the Maryland Casualty Company, or in any other insurance company writing liability insurance. No objection appears to have been made by appellants to these questions. The questions were, however, proper, and it was not error for the respondent, in good faith, to ask such questions of the prospective jurors. (10 Cal. Jur. Supp. 661.)

Appellants strongly urge that the court erred in refusing to sustain objections to the following on cross-examination.

Mr. W. R. Sherman, a civil engineer, was called as a witness on behalf of defendants. This witness took measurements at the scene of the collision, and made a map of the highway for use at the trial. He was asked on cross-examination:

"Q. By the way, who ordered you to go out and make these measurements? A. I was requested to go out by Mr. Hawkins. . . . Mr. Hawkins asked me to wait for a couple of men who would be over in a half hour's time from Modesto, to meet them and go out to the scene of the accident. . . . Q. Did they tell you their interest in the case? (Objection and argument by counsel.) A. I believe that one said he represented an insurance company, and the other was a photographer. . . . Q. They told you their interest was in behalf of the truck, didn't they? (Objection and argument.) A. I don't recall exactly what was said in that respect."

To these questions appellants interposed various objections, which were overruled, and they now argue that prejudicial error was committed in permitting the jury to be informed that Mr. Hawkins, one of the attorneys for the insurance company, had employed the engineer to meet with a representative of an insurance company, and go to the scene of the accident and take certain observations.

The questions asked, so appellants contend, do not refer to who gave the orders for the preparation of the maps and the taking of the measurements, and did not call for an answer which would show interest or bias of the witness, but the purport of the question was what a third party said concerning his interest in the case, and not the interest of the witness who made the map. Appellants also contend it was not proper cross-examination because conversation between the witness Sherman and the two men he was to meet had not been referred to on direct examination, and furthermore the answer called for hearsay evidence.

We believe, however, the questions were not objectionable and were within the reasonable limits of cross-examination. Respondents were within their rights in establishing the fact, if they could, that the engineer had, in cooperation with representatives of the truck company, located material points upon the map, discussed the case, and perhaps was looking to the company for his compensation. Furthermore, the question did not necessarily call for any reference to the insurance company. If they represented the owners or operators of the truck, plaintiffs had a right to bring out that relationship. ■ Facts tending to show interest, bias or motive on the part of a witness may always be brought out on cross-examination even though it may thereby be disclosed that the defendant was protected by insurance.

In *Coursault* v. *Schwebel*, 118 Cal. App. 259 [5 Pac. (2d) 77], a physician had made a physical examination of the plaintiff, and on cross-examination was asked as to who requested him to make such examination. The physician answered that he acted either at the request of the attorney for defendants or the insurance company, which, he did not recall. In *Levy* v. *Berner*, 110 Cal. App. 65 [293 Pac. 896], the doctor was there asked on cross-examination who had employed him, and he replied that he was requested to act by a person associated with a certain insurance company. These answers were held proper as they tended to impeach

the credibility of the witness or to show interest in the case. Notes discussing this point will be found in 56 A. L. R., page 1439; 74 A. L. R. 855, and in 95 A. L. R. 397.

■ . While attorneys may not deliberately drag in the fact that defendants are protected by an insurance company, it is very generally known in these days to every person of understanding, that most owners and operators of automobiles are now protected by some form of insurance, and particularly do they believe that common carriers operating large trucks upon the highways are so protected, so we do not believe that the questions and answers heretofore referred to could have made any difference in the final outcome of the case, or in the amount that the jury awarded.

■ Appellants also claim the evidence is insufficient to support the judgments in these cases. Without quoting extensively from the record, we have no doubt that the testimony of the various witnesses, some six or seven, if believed by the jury was sufficient to support the judgment. The testimony of the traffic officer and the statement of the driver of the truck himself, were sufficient to establish negligence *per se*.

■ It is claimed by appellants the court erred in excluding proffered testimony of expert witnesses, offering to show that at the moment of impact the semitrailer was to the east of the center of the highway. This they were attempting to do by computing the time it would take for the grain to fall from the broken sacks, the course of the trailer after damage to the axles, etc.; in other words, trying to reconstruct by expert testimony what had happened.

Courts look with disfavor upon this type of testimony upon the ground that it is impossible to establish all of the necessary elements such as the reaction of the human mind under a certain set of circumstances; the impossibility of having complete knowledge of the exact speed, course of the wind, if any, and force of the impact. Furthermore, many of the physical and mathematical facts of which the experts were to testify were given in evidence before the jury in testimony by Mr. Warren and in the instructions of the court, making the deductions by the engineers unnecessary. Also, counsel in their argument were not restricted, and fully discussed these various elements, so no material injury could have been sustained by appellants.

■ Objection is also made to a question asked by the court in regard to the effect upon one of the children of the loss of its mother. Respondents were attempting to show this effect upon the minor child, and the court asked a witness: "Q. Did you notice any change in the child, did you notice his behavior in relation to his mother?" To this question an objection was made that it was not the proper measure of damages. The court said: "The objection is overruled. The court feels it does affect the measure of damages, and if the child is grief stricken, which the court does not undertake to say whether he is or is not, but you may state what you observed in regard to the child before and after the death of the mother, if there is any difference, I don't know."

Appellants claim that is not a proper measure of damage, as a claim for the death of a person does not include damages for sorrow, grief or mental suffering occasioned to the heirs by death. The answer called forth by this question did not go to the mental suffering or grief incurred by the death of the mother, but was, "Yes, there is a little difference, for he feels a little lonesome, you might say, and we can see ourselves sometimes for quite a while when we took them home from the hospital, they would wake up at night and call for their mother and we would get up, my wife would get up, you know, and go right up to them and talk to them and then pretty soon they would talk a little better, you know, and change their mind and then they would call for the Godfather."

This answer would tend to show that the children were not so much grief stricken as they missed the care and comfort of their mother during the night.

Furthermore, the court fully instructed the jury on the measure of damages and set forth fully and correctly all of the elements that could be considered by the jury. We must assume they were governed by those instructions, and no miscarriage of justice occurred by any remark of the court.

■ It is claimed, furthermore, that the verdicts in each case were excessive. No motion for a new trial was made, which is the proper place to raise such point (*Williams* v. *A. R. G. Bus Co.,* 47 Cal. App. 568 [190 Pac. 1036]), but nevertheless we have read the record and can find no indication of bias or prejudice on the part of the jury in arriving at their verdict. We have here a claim for the death of a wife and mother who left a husband 35 years old, and two

sons 10 and 6 years old, the wife being 33 years of age, in good health, and doing all of the housework and helping with the work upon the ranch. She was active in church affairs and brought her children up in the faith of their church, taught them English, and contributed in many ways to their education and in building their character. Both the husband and the wife had an expectancy of over thirty years. We cannot say that the amount of the award here was unreasonable.

In the case of Alexandrino Moniz, he incurred injuries such as infected wounds upon the head and face, a fracture of the arm, which has resulted in a permanent disability, an injury to the nerve of the lip, which deprives it of feeling, and an injury to the chest causing a pulmonary abscess. He was in the hospital some 79 days, and after that required plastic surgery on his face. It must be remembered also that out of the $10,000 must be paid charges for medical and hospital costs of over $2,600. So, too, without enumerating the various injuries sustained by Chester, aged 6, we find that his injuries were sufficiently detailed by a doctor to justify the award granted. Among other injuries he bears disfiguring facial scars, the nerve controlling an eyelid is injured, causing the lid to droop, injury to the frontal sinus, and it will require an expensive surgical operation to correct an injury of the nose.

Finding no serious error in the record, and also that there was no bias or prejudice shown by the jurors in the verdict returned, it is the conclusion of this court that as to the judgment against J. M. Bettencourt, that it be reduced in the amount specified by section 402b of the Vehicle Code, but in other respects the judgments appealed from should be affirmed, and it is so ordered.

Thompson, J., and Plummer, J., concurred.