LITTLE *v.* GEORGE FEED & SUPPLY CO., INC.

5-2258                                              342 S. W. 2d 668

Opinion delivered February 13, 1961.

*Rucker, Tabor, Best, Sharp & Shepherd, Frank Mahan, Warner, Warner & Ragon, Douglas O. Smith, Jr.,* for appellants.

*Chas. R. Garner, Hardin, Barton & Hardin,* for appellees.

CARLETON HARRIS, Chief Justice. This is an appeal from a judgment of the Washington County Circuit Court, wherein the court directed a verdict in favor of appellees on appellants' counter-claim. The litigation arose out of a collision which occurred on Highway 68 in Benton County, on what is variously known as "Gallaher Curve", "Dead Man's Curve", "Rainbow Curve", and "Illinois River Curve", at approximately 3 p.m., on September 29, 1958. The collision involved two trucks, traveling in opposite directions, each being occupied solely by its operator. Joseph Keel Greenwood was operating a gravel truck for the Burbank Rock Company, and was traveling in a general easterly direction, toward Springdale. The truck was a 1956 F-800 Ford, dump cable bed, loaded with wood and steel. Norman Cline was operating a truck for George Feed and Supply Company, Inc., and was traveling in a general westerly direction, toward Siloam Springs. The George truck was a new 1958 International, and was carrying a load of approximately three and a half tons, at the time of the collision. The curve is considered a dangerous one, and several witnesses mentioned that numerous accidents have occurred in the general location, both before and after this particular collision. The highway is blacktop, twenty-four feet wide, with guard posts on each side, located about three feet outside the edge of the blacktop, and spaced 16.4 feet apart. The collision occurred during a drizzling rain, that had been in progress all day, and testimony indicated that the highway would become slick when wet, and was slick on this occasion. In approaching the curve from the east (moving west), the view around the curve is partially obscured by a hill; a vehicle traveling west would then go down a shallow downgrade, enter the curve to the right, and thereafter, climb a somewhat steep upgrade for the remainder of the turn. A vehicle approaching from the opposite direction would enter a sharp descending curve to the left. At the time of the collision, the George truck had almost completed making the curve, and the Burbank truck was just entering the curve, to its left.

The evidence shows that the Burbank truck hit the George truck on the left side within 2½ feet of the rear of the feed truck. After striking the George vehicle, the Burbank truck continued on to the left, across the road, and after apparently knocking down one of the guard posts, rolled into a deep gully. The George truck, upon being struck, made a 180-degree turn in a counterclockwise manner, stopped with its left side up, in its own lane, facing the direction from whence it came, and not too far from the place where the gravel truck left the road. Greenwood, driver of the Burbank truck, was killed. Cline only suffered minor bruises. Appellee Cline testified that he was traveling from 15 to 20 miles per hour, and observed the Burbank truck about 150 yards away, the latter apparently traveling at 30 to 45 miles per hour. He stated that the Burbank driver appeared to be crowding the yellow line, and that he (Cline) was on his right side of the highway at all times. The witness testified that the cabs of the two trucks were three or four feet apart when they passed, and that the Burbank driver was doing nothing to give appellee any cause for alarm; ''The first I knew was after we hit—kebang! Like that, I knew he had hit me.'' When the collision occurred, feed (from the feed truck) covered the highway to such an extent that the point of impact could not be determined. Luther George, vice-president of appellee company, and Victor Hanshaw, trooper with the Arkansas State Police, both went to the scene soon after the collision occurred. Feed was all over the highway, and George had several employees sweep the highway clean. The witness stated that he could not find any signs or marks indicating, or relating to, the collision, either before or after the feed was removed from the highway. Hanshaw likewise testified that he was unable to find any marks on the highway. Others viewed the premises soon after the collision, but no witness was presented by either side who could testify that marks or signs were present on the highway following the collision. The wet highway, feed spilled onto the highway,

and traffic going through, apparently obliterated any marks that might have been made.

Appellee, George Feed and Supply Company, Inc., instituted suit for property damage, and appellee Cline sought damages for personal injuries. Burbank Rock Company filed an answer and counterclaim seeking damages for the value of its truck which it alleged to be demolished, and the administrator in succession of the estate of Greenwood answered, and filed his counterclaim against appellees, seeking recovery for alleged mental pain and anguish, conscious pain and suffering, loss of consortium, funeral expenses, and loss of contributions in the total amount of $200,000. The case proceeded to trial, and at the conclusion of the evidence, both sides moved for a directed verdict. The court granted the motion as to the counterclaim, and instructed the jury to find for appellees in that respect; the court, however, denied the motion to direct a verdict in favor of appellants as to the complaint filed by George and Cline, and this issue was presented to the jury. The jury returned its verdict, finding for Burbank Rock Company, Inc. From the judgment entered in accord therewith, appellants prosecute this appeal. There is no cross-appeal by appellees. Appellants stringently insist that the court erred, first, in not admitting expert testimony proffered by appellants, and secondly, in directing a verdict against the appellants. We proceed to a discussion of these contentions in the order mentioned.

The first contention relates to the refusal of the court to admit the testimony of Ralph H. Snyder, of Oklahoma City, a safety engineer. The proof, relative to his qualifications, showed that he had been in the engineering field for approximately 28 years, and had been doing accident analysis work for several years. He had served as safety director for Spearman Aircraft Company (now Boeing), and Beechcraft Company, for 2½ or 3 years; assistant state safety consultant for the Works Progress Administration in Oklahoma; chief safety engineer for Tinker Air Force Base at Oklahoma City, and had served as safety director for the City Bus

Company of Oklahoma City. Snyder is now in business
for himself, operating, according to his evidence, three
businesses, including an "accident analysis laboratory".
Snyder explained that, in the latter business, he recon-
structed the manner of an accident on the basis of the
physical evidence, such as skid marks, gouge marks, and
other physical evidence that might be present.[1] Snyder
testified that he made an investigation of the collision
here in litigation, making a visit to the scene on May 8,
1959; that on the same date, he took photographs of the
George truck, and two or three weeks later, made a trip
to Ponca City, Oklahoma, about 100 miles away, and
viewed the remains of the Burbank truck, tractor and
trailer unit. In the meantime, the wheels and tires had
been taken off, and the motor and radiator removed from
the truck. Measurements were made at the scene, and
measurements were furnished relative to the vehicles
involved. Snyder testified that he had an opinion as to
how the accident happened, and in response to a hypo-
thetical question propounded by appellants' counsel,
offered the opinion. After numerous objections[2] and

---

[1] From the testimony: "That is a business in which attorneys and
investigators send me their difficult accident cases and in which we
reconstruct the accident on the basis of physical evidence, practically
in the same manner in which a criminologist would analyze a crime.
And we use the same science of the reconstruction of these accidents
in parallel relationship; for example, a criminologist uses ballistics to
identify which gun bullets came out of and projectory bullets—we use
the science of angle and point of impact in order to determine how
the vehicles came together. They use the science of finger printing or
leaving of finger prints on—at the crime scene. To us, skid marks or
gouge marks in the pavement are parallel to finger prints and we can
tell the position and how they were laid down by the skid marks or
gouge marks in the pavement. * * * Of course, if the vehicles are still
available, I go to see the vehicles themselves, and also visit the scene.
* * * we have run demonstrations and tests. We have taken actual
cars and crashed them in order to be able to tell the results of known
said speeds and angles. We have run speed tests on brakes so as to be
able to determine braking distances from skid marks and we go into
the thing on a scientific and accurate basis."

[2] "Counsel for Appellees: Objection, Your Honor, both the ques-
tion and the proposed answer for the reason that same are hypotheti-
cal, not complete, not in proper form, not based upon all the evidence
in the case, based upon hearsay, based upon incompetent evidence,
based upon irrelevant evidence, based upon immaterial evidence, based
upon evidence not introduced in the case and invades the province of
the jury; calls for a conclusion. Based upon assumption, ignores
uncontroverted evidence, ignores contradicted evidence, and for
the further reason that there is nothing in this case to indicate that it
is impossible or beyond the jurors' ability to understand the facts and

much discussion between the court and counsel on both sides, the witness commenced to answer the question as follows: "A. My opinion is that at the time of impact, the rear end of the feed truck was over the center line, that is, at the instant of impact, in order for the feed truck to make a complete revolution, come to rest on its side of the road without striking a pole and * * *" Upon objection, the court held that the reasoning was not supported properly from the testimony and the evidence, and on motion of appellees' counsel, ordered that it be stricken and withdrawn from the jury.

Appellants assert:

"This is a classic example for the need of expert testimony. The usual, normal and expected indicia of negligence are not present. There are no eye witnesses. Cline states that each vehicle was on its side of road and he does not know how the accident happened, and rain and chicken feed obscured all marks of impact on the pavement. It becomes necessary, therefore, to reconstruct the accident from the damage done the vehicles, the missing guard post, and the nature and dimensions of the vehicles and highway. To contend that the average juror has competent knowledge to interpret the various ramifications involving stresses, strains, kinetic force and effects of impact upon vehicles and metals is utterly ridiculous."

The offer of proof on behalf of the witness covers several pages, and would unduly extend the length of this Opinion. His opinion was based, *inter alia,* on the following premises: First, the fact that a guard post was not knocked down by the George truck as it made its counter-clockwise turn. Since the posts were located at intervals of approximately sixteen feet, each post being approximately fifteen feet from the center of the highway, and the truck was something over twenty-two feet in length, Snyder concluded that the feed truck could not have been on its right side of the highway at the time of the

---

draw their own conclusions and for the further reason there is lay testimony, ***."

collision, for it would have, due to its length, knocked down a post when spinning around; serrations or gouges were found on the highway, which, according to the witness, had been caused by a bar, or rail, on the side of the feed truck, which dug into the highway after the overturned truck first slid up the highway—then back for several feet. His opinion was further based on an examination of the vehicles, which the witness stated indicated that the collision was a "whipping type", rather than a sideswipe; in his view, if the trucks had sideswiped, contact would have been made nearer the front, rather than to the rear of the truck. He was of the opinion that the feed truck had to have been over the center line, and the rear portion at an angle, in the process of returning to its own side of the highway at the time of the collision, in order for the two vehicles to make contact as heretofore described, and also, for the feed truck to have had room to make a half-turn, without hitting one of the posts on the side of the highway. We think the court acted properly in excluding this testimony. In *Conway v. Hudspeth,* 229 Ark. 735, 318 S. W. 2d 137 (which involved the collision of three vehicles), a trained state police officer, who had investigated the accident before the vehicles were removed, was asked his opinion as to the order in which the collisions occurred. The appellants recognize that we sustained the trial court's view that such testimony was inadmissible. This Court said:

"We do not agree with the appellants' contention that the proffered testimony was admissible as the opinion of an expert. It has been said that the courts look with disfavor upon attempts to reconstruct traffic accidents by means of expert testimony, owing to the impossibility of establishing with certainty the many factors that must be taken into consideration. *Moniz v. Bettencourt,* 24 Cal. App. 2d 718, 76 P. 2d 535. In the case at hand the officer was not asked to describe every physical fact that he had seen and then to explain his deductions, in the manner that ballistic experts often explain their conclusion that a certain weapon fired a certain bullet. Here the officer was asked his opinion on

the basis of the position of the vehicles, the damage to them, 'and other physical evidence found at the scene.' In the absence of anything to indicate that it was beyond the jurors' ability to understand the facts and draw their own conclusions, there was no need to resort to expert opinion.''

Appellants argue that in the *Hudspeth* case, other evidence, concerning the manner in which the collission occurred, was available, while such is not true in the case before us. We do not unequivocally hold "reconstruction" of an accident by an expert to be inadmissible when supported by proper evidentiary facts, but we do say that the evidence in this case, upon which Snyder's opinion was predicted, was inadequate to support his conclusions. For instance, it is clear that his opinion was, in part, based upon the serrations, or gouges, found in the highway. The unqualified testimony introduced at the trial was to the effect that no marks, of any kind, were found upon the road following the collision. Of course, there was no way of determining that the gouges referred to by Snyder were occasioned by the wreck on September 29th. In fact, all the evidence was to the contrary. Traffic had been traveling this highway for seven months before Snyder made his investigation. It is true that the witness stated that he could give an opinion without taking these marks into consideration, but Snyder's answers in response to extensive interrogation by the court, leave the impression that the marks contributed somewhat to his opinion in the overall picture.[3] The court also inquired as to the scientific basis

---

[3] At page 250 of the transcript:

"The Court: After it went up, it stopped, complete stop, and it scooted back down?

A. It scooted back down.

The Court: How many feet did it scoot back down and why did it quit scooting? What stopped it, on a three per cent grade? Do you mean to tell me that weight, after it comes to a complete stop—before scooting again?

A. Yes, Your Honor. If you will notice - - .

The Court: Again, you are basing it on these marks you saw in May, though?

A. Yes, Your Honor.

The Court: You think it would scoot back down that way and make those marks on its own momentum?

used by Snyder in reaching certain deductions, to which no concrete answer seems to have been given, and we agree with the trial court that it appears that the witness' opinion was, at least to some degree, based upon assumptions, not justified by the evidence. We are aware of the Oklahoma case of *Leeper* v. *Thornton,* 344 Pac. 2d 1101, cited by appellants. There, the Court said: "The testimony of the witness, Ralph H. Snyder, when considered with supplemental and corroborative evidence, is sufficient to support the verdict." The "corroborative evidence" is not fully set out, though the facts enumerated disclose some factual difference between that case and the one at Bar. Without entering into a detailed discussion, suffice it to say that we are not, under the circumstances of the case before us, willing to permit an opinion based on evidence obtained at the scene more than seven months after the collision, and an inspection of the vehicles subsequent to that time, and after one of the vehicles had been partially dismantled. As stated in 32 C. J. S., § 522, p. 220:

"While absolute certainty is not required of an expert, it is necessary that the facts on which an expert relies for his opinion should afford a reasonably accurate basis for his conclusions. Accordingly, no matter how skilled or experienced the witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture; in other words, the factual foundation for the expert opinion must not be nebulous."

Appellants assert that even though this Court should find that Snyder's testimony was properly excluded, there was still sufficient evidence to submit appellants' counterclaim to the jury. In this connection, they point out that the undisputed testimony shows "that the curve on which the collision occurred was very dangerous; that

---

"A. Yes, Your Honor. It had to be. That's the only way - - .
The Court: You are assuming these were there at that time? That is your assumption there?
A. I'm assuming - - .
The Court: The marks you saw in May were there in September?
A. Made by the truck when it turned over on its side.
The Court: All right."

the view was obscured when approached from Springdale; that it was raining and the highway was very slick; that the plaintiff, Cline, was familiar with the curve and aware of the danger; that the plaintiff, Cline, went into the curve doing 20 to 25 miles per hour with three and one-half tons of feed on his truck;[4] that he had no cause for alarm as he passed the Burbank truck.'' Of course, Cline testified that his truck was on the right side at all times, but appellants correctly state that this evidence cannot be considered in the motion for directed verdict made by appellees, since the testimony of a party is considered disputed as a matter of law. Appellants state:

''Under this state of facts, certainly the jury might have found that 20 to 25 miles per hour was too fast to proceed in a dangerous curve, especially with limited vision and on slippery pavement, and that the negligence of the plaintiff Cline in this respect proximately caused the fatal collision which is otherwise left unexplained by plaintiff Cline. The question of speed and its proximate effect are traditionally for the jury, especially under hazardous circumstances as existed here.''

In addition, appellants again urge the fact that the George truck admittedly did not strike a post when turning around; that the truck turning within a 15-foot radius (as the George truck would have been doing on its own side of the highway) would necessarily have hit a post; and they contend this was a circumstance indicating, and from which the jury could have found, that the George truck was on the wrong side of the highway at the time of the collision. We do not agree with appellants' contentions.

Leaving out Cline's testimony, which was disputed as a matter of law, there is no testimony as to Cline's speed at the time of the collision.[5] If the jury had not believed Cline, there simply would have been no evidence

---

[4] The Burbank truck was carrying a load of seven tons.

[5] Actually, Cline testified that he had reduced his speed from 20 to 25 miles per hour to 15 miles per hour before the collision occurred, when he first saw the Burbank truck, approximately 200 yards away.

of speed, and no basis for the jury to find that he was proceeding up the hill in a careless or negligent manner, i. e., the failure to believe appellee would not have given appellants any affirmative evidence. If, on the other hand, the jury considered Cline's speed of 20 to 25 miles per hour on entering the curve to be too fast, that fact would have to be tied-in with another premise before the jury could find that it was the proximate cause of the collision, i. e., such speed caused him to skid to the wrong side of the highway. There is nothing in the record to indicate that the George truck was skidding, and that its rear skidded onto appellants' side of the highway; in fact, if we enter the field of speculation, ordinary experience teaches that one is more likely to skid on slick pavement when applying brakes—and brakes are more frequently applied while going down hill, as was the Burbank truck, than in going up hill. Appellants' argument relative to the George truck not striking the post is predicated upon the theory that the truck spun around its front wheels, i. e., the front wheels served as the axis of rotation, but there is no showing that this was true. The axis of rotation could have been the center of the truck, in which event the front of the George truck would have been thrown onto the left side of the highway, and the back end, swinging around, would have cleared the posts. In fact, one could surmise that the wreck happened in any number of different ways, which only emphasizes the "guesswork" involved in reaching a conclusion. We think it evident that to return a verdict for appellants, the jury would have been required to enter the field of conjecture.

Finding no reversible error, the judgment is affirmed.

McFADDIN and ROBINSON, JJ., dissent.

ED. F. McFADDIN, Associate Justice, dissenting. The majority has decided two points, and I respectfully dissent on both.

I. *The Majority Opinion Holds That The Trial Court Was Correct In Refusing To Permit The Testi-*

*mony Of The Expert Ralph H. Snyder*. For convenience, I will refer to the appellant as "Little" and the appellee as "George Feed Company." Little offered the testimony of Ralph H. Snyder as an expert witness. His qualifications were detailed at considerable length. If George Feed Company had doubted Snyder's qualifications, an objection should have been made and the Court could have ruled on his qualifications as an expert. *Fireman's Ins. Co.* v. *Little*, 189 Ark. 640, 74 S. W. 2d 777. But that was not the course that George Feed Company pursued. After the various matters had been stated and hypothetical matters assumed, the expert was asked to state his opinion and the Trial Court would not allow him to give his answer. This brings up the important question of the right of a litigant to have expert evidence as to the cause of an automobile accident.

In the case at bar there was only one person alive who was present at the collision, and that was Cline. Certainly, the jury needed as much information as it could get; and expert testimony would have helped the jury. Snyder had made a detailed study and said that he had an expert opinion; and I think the jury should have been allowed to hear his opinion. What the jury might have thought of his evidence, I do not know, but the jury was entitled to learn what was the opinion of the expert. In Am. Jur., Vol. 5A, at page 870 ("Automobiles and Highway Traffic," § 992), in discussing expert and opinion evidence as to the cause of an accident, the text says that there is a category of cases: "(3) where the opinion is that of an expert who did not observe the accident or the conditions after the accident"; and as to that type of testimony, the text says:

"Thus, where the issue was whether an automobile collision was caused by the defendant's driving on the wrong side of the road, the opinion of an expert in automobile driving was held admissible, supported by demonstrations before the jury, that if the defendant's car had approached the place of the accident on its left side of the road, the lights of the other car, approaching from

the opposite direction, could not possibly have shone on the front of it, because of the curve in the road. But the opinion of such an expert witness is not admissible where the circumstances can be fully placed before the jury and the inference from those circumstances is within the competency of the jurors.'"[1]

The trend of the holdings is to admit the testimony of expert witnesses in cases like this one. In the 1960 Cumulative Supplement to Volume 5A of American Jurisprudence, § 991, on Automobiles and Highway Traffic, the text reads:

"Although some cases hold or recognize that skilled or expert opinion evidence as to the point of impact or collision is not admissible in motor vehicle accident cases, these courts, for the most part, taking the view that the subject matter is not one requiring skilled or expert opinion testimony, or that the admission of evidence of that kind improperly invades the province of the jury, or both, *there is strong, and apparently growing, authority holding or recognizing that skilled or expert opinion evidence is admissible upon the question. These courts recognize that opinions given by skilled or expert witnesses aid the jury, or the court sitting in lieu thereof, in drawing correct inferences from the raw and unsorted facts, and that such evidence does not usurp the province of the jury, since the jury does not have to accept the witness' opinions.* In addition, it may be noted that the cases holding or recognizing the admissibility of skilled or expert opinion evidence show that the witness giving the testimony had an opportunity to investigate the scene reasonably soon after the accident and had sufficient experience to form a reasonable opinion based upon his observations. *Skilled or expert witnesses who have been offered to give opinion evidence as to the point of impact or collision in motor vehicle accident cases include law*

---

[1] There is an annotation in 38 A. L. R. 2d 62, § 24, on this matter of expert testimony as regards automobile accidents.

*enforcement officers, garagemen and mechanics, and engineers and traffic experts."*[2] (Emphasis supplied.)

The majority says that Mr. Snyder talked of marks and gouges on the pavement and that other witnesses had testified that none existed. This very conflict presented a matter for the jury to decide as to who was correct. If the other witnesses said there were no marks and Snyder said he found marks, then the jury should decide who was right. Why should this Court hold that Snyder was wrong? It was for the jury to decide. Furthermore, the witness Snyder said he could testify independently of any such marks and gouges, and still he was not allowed to testify. The majority quotes a portion of his testimony about one of the vehicles sliding backwards, as though that quoted testimony was any reason for refusing to let the expert testify. He could have been taken on cross examination and maybe that point could have been clarified or disproved. It seems to me that the majority is placing itself in the jury box in discrediting Snyder's testimony and holding that he should not have been allowed to testify.

In some of the cases it is stated that the testimony of an expert invades the province of a jury. The expert is to give the jury as much information and help as possible so that it may correctly decide the facts. The witness Snyder had made a detailed study of the locale of the accident and of the damaged vehicles. The majority quotes from *Conway v. Hudspeth,* 229 Ark. 735, 318 S. W. 2d 137. But the language in that case does not decide the point here at issue. There, the police officer was not asked the detailed facts but was asked for only "other physical evidence found at the scene." The expert should detail all that he saw and found and then give his conclusion; so it is clear that the question was not properly phrased in the quoted case. Furthermore, in the cited case the majority opinion states that in the absence of anything to indicate that it was beyond the jury's ability

---

[2] There is an annotation in 66 A. L. R. 2d 1069, § 9, on the admissibility of testimony of engineers and traffic experts as to the point of collision in an automobile accident.

to understand the facts and draw their own conclusions, there was no need to resort to expert opinion. There were several eye witnesses in the Conway case, so there was no need to resort to expert testimony. However, as previously stated, in the case at bar there is only one person alive who was present at the accident, and he was already past the point of impact before the collision occurred. If there ever was a case where the jury needed expert testimony to aid it in arriving at a conclusion, it seems to me that this is the case. Therefore, I respectfully dissent from the first point decided by the majority.

II. *The Majority Is Holding That The Trial Court Was Correct In Refusing To Submit Little's Counterclaim To The Jury.* The Trial Court submitted the direct complaint of the George Feed Company to the jury. If there was evidence enough to take the George Feed Company's claim to the jury, then there was evidence enough to take Little's counterclaim to the jury. The knocking down of the post, the marks on the two vehicles—all of those facts were just as strong for Little's counterclaim as they were on George Feed Company's direct claim.

Furthermore, it is most significant that the jury refused to return a verdict for the George Feed Company and Norman Cline; so it is a reasonable assumption that the jury did not find the George Feed Company and Cline to be free of negligence. It is definitely established that the collision happened. Somebody was on the wrong side of the road. If the deceased Greenwood was on the wrong side of the road, then the jury should have returned a verdict for George Feed Company and Cline. But when the jury failed to return a verdict for George Feed Company and Cline, it rather strongly suggests to me that the jury thought that Greenwood was not on the wrong side of the road. The counterclaim of Little should, therefore, have gone to the jury; and I dissent from the majority holding on this point also.

Robinson J., joins in both points of this dissent.