[Civ. No. 20328. First Dist., Div. One. Nov. 7, 1963.]

DOROTHY GRIGG FRANCIS et al., Plaintiffs and Respondents, v. LAWRENCE A. SAUVE, Defendant and Appellant.

Pelton, Gunther & Gudmundson, Charles E. Goff, Broad, Busterud & Khourie and Michael N. Khourie for Defendant and Appellant.

Jack H. Werchick for Plaintiffs and Respondents.

SULLIVAN, J.—In this action for damages for wrongful death, the jury returned a verdict in favor of plaintiffs and against the defendant Lawrence A. Sauve in the sum of $46,000. Sauve appeals from the judgment entered on the verdict. The same jury returned a verdict in favor of the defendant Henry L. Ratliff and against the plaintiffs. Plaintiffs have not appealed from the adverse judgment entered on this verdict.

On November 14, 1957, at about 1:15 p.m. defendants Sauve and Ratliff and plaintiffs' decedent Robert J. Francis were driving their respective automobiles in an easterly direction on Market Street near Seventh Street in San Francisco. The three cars were proceeding in the following order: first, a Ford driven by Ratliff; next, a Plymouth driven by Francis; and last, a Studebaker driven by Sauve. Ratliff stopped his car for a red light at the intersection of Market and Seventh Streets, Francis stopped behind Ratliff. However, Sauve failed to stop and drove his vehicle into the rear of the Francis car which in turn was caused to collide with the Ratliff car ahead of it.

Prior to this accident plaintiffs' decedent had suffered from high blood pressure for several years. In October 1956 he consulted with Dr· David L. Rodgers who diagnosed his then condition as one of severe hypertension. In April 1957 he suffered a stroke which required that he be hospitalized. After his discharge from the hospital and a four months' period of recuperation, Francis carried on a normal active life. He returned to work and continued working until the day before he died.

On November 15, 1957, the day after the above accident, Francis consulted with Dr. Rodgers, complaining of pain in his neck. Dr. Rodgers diagnosed the injury as ''a whiplash type of injury or sprain to the neck'' and prescribed physiotherapy.

On December 1, 1957, shortly after midnight, Francis was admitted to Stanford Hospital where he died a few hours later from a cerebral stroke.

Plaintiffs, the wife and three children of the decedent, commenced the instant action on February 4, 1958, alleging that as a result of the negligence of Sauve and Ratliff, Francis sustained serious personal injuries in the collision of November 14, 1957, as a result of which he died on December 1, 1957. Defendants denied all of the material allegations of the complaint and raised the defense of the decedent's contributory negligence.

Defendant Sauve, the sole appellant herein, now presents a number of contentions which, he asserts, compel our reversal of the judgment. We propose to consider them in the order presented. Unless otherwise indicated, our reference hereafter to the ''defendant'' will mean the above mentioned defendant-appellant.

1. *Admissibility of decedent's statement to police officer.*

Defendant contends that the court erred in receiving in evidence as part of the res gestae a statement made by the decedent at the scene of the accident to the police officer who investigated it·

San Francisco Police Officer Rudolf K. Haase, a member of the Accident Investigation Bureau, called as a witness for plaintiffs, testified that he investigated the accident here involved. He received the call at 1:23 p.m. and arrived at the scene at 1:35 p.m. There is however no precise evidence in the record as to how long after the occurrence of the accident the above call was made. Nor does the record disclose how long after his arrival at the scene, Officer Haase talked to the decedent and heard the statement here objected to. He testified that all three drivers were ''in the vicinity'' when he arrived but he was unable to recall which driver was interviewed first. He appears to have followed his general practice of interviewing the drivers involved upon his arrival at the scene of the accident. We think that it is a fair statement of the record to say that Haase talked to the decedent at or within a short time after 1:35 p.m.

On direct examination Haase was asked what the decedent

said to him at the scene of the accident. Defendant objected that such a statement would be self-serving. Plaintiffs' counsel indicated that the admission of the statement was sought as part of the res gestae. Defendant further objected that no foundation had been laid and that decedent's statement was not part of the res gestae. After inquiring of the witness as to how long after the impact he arrived[1] the court expressed some doubt that the decedent's statement was part of the res gestae, in response to which plaintiffs' counsel contended that "it could depend on what occurred and the circumstances." The court then overruled defendant's objection and the following occurred: "Q. Tell us what was said by Mr. Francis, the operator of number 2, please? THE WITNESS: A. He stated he had stopped for about one second when struck. MR. WERCHICK: Q. Say it out louder. A. He stated he had stopped for about one second when struck." This is the statement of which defendant complains.

█ To render a declaration admissible as part of the res gestae or as a spontaneous declaration "it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it. (Wigmore on Evidence (2d ed.) § 1750.)" (*Showalter* v. *Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895]; *Lane* v. *Pacific Greyhound Lines* (1945) 26 Cal.2d 575, 581-582 [160 P.2d 21]; *People* v. *Costa* (1953) 40 Cal.2d 160, 168 [252 P.2d 1].) █ In determining the admissibility of a declaration claimed to be part of the res gestae, there is necessarily some element of discretion in the trial court. (*Showalter* v. *Western Pacific R.R. Co., supra; Wiley* v· *Easter* (1962) 203 Cal.App.2d 845, 851 [21 Cal.Rptr. 905].) █ In this determination, the amount of time elapsing between the occurrence and utterance, while not a controlling factor, is an element to be considered. (*Wiley* v. *Easter, supra; People* v. *Bernalley* (1960) 185 Cal.App.2d 326, 330 [8 Cal.Rptr. 375]; *Dolberg* v. *Pacific*

---

[1]The witness stated when he received the call and when he arrived at the scene. He was apparently unable to give a direct answer to the court's question.

*Electric Ry. Co.* (1954) 126 Cal·App.2d 487, 489 [272 P.2d 527].) Generally speaking it is the function of the trial judge to consider and decide whether all of the elements essential to the application of the res gestae rule are present. (*Dolberg* v. *Pacific Electric Ry. Co., supra.*) However, it is to be noted that burden of proving the admissibility of a declaration as part of the res gestae or as a spontaneous declaration rests upon the party who seeks to introduce it into evidence. (*Wiley* v. *Easter, supra.*)

In the case of *Wiley* v. *Easter, supra,* one of the two investigating officers, called by the defendant, testified that he talked to the defendant after the accident as to how it occurred. The officer made notes which were ultimately carried into a typed police report, a part of which was prepared by each of the officers and which was signed by the other officer. The witness did not have his notes at the trial and apparently had no independent recollection of his conversation with the defendant. Over plaintiff's objection, he was permitted to read from the police report his version of the statement made to him by the defendant. The court reversed the judgment for defendant, stating: " [D]efendant failed to show when or where her statements were made, whether the excitement of the accident had worn off, whether she was under the influence of sedatives at the time, what portions of her statement were volunteered and what were elicited by questions of the officer which were perhaps suggestive, or by questions which required deliberation in answering. Indeed, it does not affirmatively appear that the pertinent part of the report was made by Officer Welch, or that he knows it to have been correct at the time it was made; hence, under section 2047, Code of Civil Procedure, [footnote omitted] there was no foundation for reading from it. Neither the report nor its content was admissible in evidence because no competent foundation had been laid. It was error to receive it in evidence or, speaking more accurately, an abuse of discretion." (203 Cal.App.2d at pp. 855-856.)[2]

 In the case before us, the first and third requirements of the rule announced in the *Showalter* case appear to

[2]The court made the following observation on the type of interview eliciting the statement: "A statement resulting from a question and answer interview of a motorist involved in an accident, especially when conducted by a police officer, suggests at once lack of spontaneity and on the contrary points to deliberation upon the facts engendered by an instinct of self-protection against claims of liability, civil or criminal." (203 Cal.App.2d at p. 854.)

have been satisfied. It is reasonable to conclude that the collision was startling enough to produce a stress of nervous excitement so as to render an utterance spontaneous and unreflecting. It is also clear that the utterance here involved relates to the occurrence preceding it. But was the decedent's statement made while nervous excitement still dominated and his reflective powers were still in abeyance? While defendant argues that there was no evidence of the time of the accident, the parties appear to agree and defendant states in his brief, that the accident happened at about 1:15 p.m. In the light of the police officer's testimony we think it is a reasonable conclusion that he talked to Francis about 20 minutes after the accident. However the record fails to disclose Francis' condition at this point of time which obviously cannot be considered as being concurrent with the collision or even as being immediately after it. It is an inescapable fact that some substantial time had elapsed since the collision. There is no evidence that Francis was unconscious or in a state of shock at any time after the collision or that he received emergency treatment at the scene. He was not taken to a hospital and did not even see a doctor until the next day. Plaintiffs direct our attention to certain testimony to the effect that Francis was "upset" at the time of the accident and again when his wife saw him at 2:30 p.m. Although this implies that the decedent was "affected by an emotional disturbance" (see Webster's Third New International Dictionary) at those times, we are furnished with no details or circumstances of this upset condition at the times designated. Assuming that the collision may have produced some stress of nervous excitement, plaintiffs failed to show what the decedent's condition was at the time the statement was made, whether or not the excitement had subsided 20 minutes after the collision, or under what circumstances the statement was made—whether volunteered spontaneously or given deliberately in answer to the officer's questions and after an opportunity to reflect. This was plaintiffs' burden. The record set forth above eloquently demonstrates that plaintiffs failed to meet this burden and upon the defendant's objection made no attempt at all to prove the circumstances surrounding the statement so as to establish its admissibility. We conclude that no foundation had been laid for the introduction of the statement and that it was error for the court to receive it in evidence.

Nevertheless such error was not prejudicial. The sole import of Francis' statement was that he was stopped behind

Ratliff ''for about one second'' before he was struck by Sauve. The witness Shook, who was waiting for a streetcar at the intersection, testified that ''there were two automobiles, they had already stopped for the light, and all of a sudden here comes a third car coming down the street and hitting the second car'' and that then ''the second car went into the first car.'' On cross-examination Shook again testified that he saw the Sauve car hit the Francis car. [2a] Shortly thereafter during an extensive interrogation by the court the witness asserted that he saw the third car ''on the crash,'' that he was looking in the direction of the cars when the impact occurred, that there were ''two already'' at the intersection because the light was against them and that what made an impression on him was ''the squeal of the car that came up and hit the second car.''[2b] We think that a fair reading of the cross-examination testimony is that, as on direct, the witness Shook was looking in the direction of the first two cars stopped at the signal and saw the third car (Suave's) hit the second car (Francis'). Defendant himself testified when called by plaintiffs under Code of Civil Procedure section 2055 that he noticed the Francis car ''was stopping—he was halfway stopped'' and that he then attempted to stop. During the course of such section 2055 examination, Sauve admitted that the accident happened when he was looking to the left and when he looked back, he saw Francis' car had the brakes lights on; that he applied his brakes the minute he saw the lights, thought he could stop but didn't. Although he stated that he believed Francis' car was moving when his car hit it, upon succeeding questions by the court and plaintiff's counsel he stated ''I really don't recall.'' The jury could have concluded, even without Francis' statement, that Francis had brought his car to a stop an instant before he was struck by Sauve. After an examination of the entire cause, including

[2a] ''Q. And actually you did not see this accident happen at all, did you? A. I just saw the first two cars that were stopped, and that was — Q. Let me ask you this, isn't it a fact that the thing that drew your attention there was the crash of the accident? A. Yes. Q. And you didn't see the accident itself? A. I saw the third car hit the second car.''

[2b] The court then continued: ''THE COURT: Q. Did you see that or did you hear this squeal of brakes? Did you see the car as it approached before the impact? THE WITNESS: Yes, right after. THE COURT: Q. Was it the squeal of brakes and the sound of the impact that attracted your attention to the third vehicle? THE WITNESS: A. That's correct.''

the evidence, we cannot say that it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the above error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[3]

2. *Admissibility of police officer's opinion as to the order of impact.*

 Officer Haase testified in detail on direct examination to the physical facts observed by him at the scene of the accident. These included the general layout of the area, the location of the vehicles, the location and length of skid marks left by Sauve's car and the location of debris indicating points of impact. During the course of this examination, plaintiffs' counsel attempted on several occasions to elicit from the witness testimony as to which impact occurred first — the impact between Francis' car and Ratliff's car or that between Sauve's car and Francis' car. Defendant's objections to these questions were sustained by the court. Nevertheless towards the close of the direct examination, the witness was asked for his opinion as to the order of impact and over the objection of defendant testified ''[t]hat the hindmost car struck the second car prior to the collision between the second and first.''

Defendant claims that the admission of such opinion was error because (a) it was not a proper subject of expert testimony; (b) it concerned a matter capable of direct proof; (c) it was based on hearsay rather than the witness' observations; and (d) it was based on other conclusions which the jury need not have accepted.

 ''The general rule . . . is, that witnesses must testify to facts, and not to opinions, and that whenever the question to be determined is the result of the common experience of all men of ordinary education, or is to be inferred from particular facts, the inference is to be drawn by the jury, and not by the witness.'' (*Sappenfield* v. *Main St. etc. R.R. Co.* (1891) 91 Cal. 48, 60 [27 P. 590]; *Burch* v. *Valley Motor Lines, Inc.* (1947) 78 Cal.App.2d 834, 839 [179 P.2d 47]; *Wells Truckways, Ltd.* v. *Cebrian* (1954) 122 Cal.App.2d 666, 673 [265 P.2d 557].) Nevertheless, the opinion of a witness is admissi-

---

[3]Cf. *Wiley* v. *Easter, supra,* 203 Cal.App.2d 845, where defendant's statements to the investigating officer were different from and more favorable to her than her testimony at trial. The admission of her statements therefore had a definite effect on the jury's verdict and, as the court concluded, a result more favorable to plaintiff was reasonably probable in the absence of her statements.

ble "on a question of science, art, or trade, when he is skilled therein." (Code Civ. Proc., § 1870, subd. 9.) It has been said that the underlying reasons for the admission of such an opinion is that "it deals with 'matters not presumably within the common knowledge of men' [citation] and 'was proper and necessary to an enlightened consideration and a correct disposition of the ultimate issue' [citation]." (*Burch* v. *Valley Motor Lines, Inc., supra,* at p. 839; *Wells Truckways, Ltd.* v. *Cebrian, supra.*) Basically, the question in each case is whether the testimony in question falls within the general rule or within the ambit of the above statute.

Applying these broad rules, California courts have approved the use of expert testimony in cases involving traffic accidents. A police officer trained and experienced in the investigation of traffic accidents and in the rendering of official reports on the facts and causes of the same, may give expert testimony as to the point of impact when his opinion is based upon his inspection of the physical evidence at the scene of the accident. (*People* v. *Haeussler* (1953) 41 Cal.2d 252, 260-261 [260 P.2d 8], cert. denied 347 U.S. 931 [74 S.Ct. 533, 98 L.Ed. 1082]; *Zelayeta* v. *Pacific Greyhound Lines* (1951) 104 Cal.App.2d 716, 727 [232 P.2d 572]; *Kalfus* v. *Fraze* (1955) 136 Cal.App.2d 415, 423 [288 P.2d 967].) However, his opinion as to the point of impact is not admissible when it is based on what witnesses told him rather than what he himself observed. (*Ribble* v. *Cook* (1952) 111 Cal. App.2d 903, 906 [245 P.2d 593]; *Stuart* v. *Dotts* (1949) 89 Cal.App.2d 683, 686-687 [201 P.2d 820].)

On the other hand, our courts have refused to admit in evidence expert opinions in traffic accident cases where the factors involved are too varying and indefinite to constitute the basis of an opinion as, for example, where the opinion sought to be elicited dealt with the probable course of the cars after impact (*Fishman* v. *Silva* (1931) 116 Cal.App. 1, 8-9 [2 P.2d 473]) or with the speeds of the vehicles and the manner in which the accident occurred (*Johnston* v. *Peairs* (1931) 117 Cal.App. 208, 213-216 [3 P.2d 617]) or with the nature, points of application, magnitude and effect of forces involved in the collision of automobiles (*Rudat* v. *Carithers* (1934) 137 Cal.App. 92, 95-97 [30 P.2d 435]). (See also *Moniz* v. *Bettencourt* (1938) 24 Cal.App.2d 718, 725 [76 P.2d 535].) The rationale of these decisions is that in this particular area there are too many indefinite factors, including the behavior and reactions of the drivers involved, to permit a

conclusion to be reached after the fact with any quantum of certainty. As the court stated in *Burch* v. *Valley Motor Lines, Inc., supra,* 78 Cal.App.2d 834, 844, the foregoing cases represent unsuccessful attempts "to reconstruct what had happened, by persons who were not eyewitnesses and with nothing on which to base their opinions but the position of the cars after they had come to rest."

We think that the general tenor of the precedents in this state indicates a disapproval of expert testimony designed to reconstruct what occurred in a traffic accident. In our view, the principle thus evolved is not changed by the fact that the accident involves a three-car collision. No California case has been found, nor has any been cited, involving the use of expert testimony to establish the order of impact in such type of accident.[4] Nevertheless, we feel that in a situation involving more than two cars the problem of giving an opinion as to what happened is rendered even more complicated by additional "varying" and "indefinite" factors. Clearly the effect of Officer Haase's testimony in the instant case was to reconstruct how the accident happened. We conclude that the trial court committed error in admitting the officer's opinion.

However the error was not prejudicial. As we have already pointed out, there was independent and competent evidence offered through the witness Shook that the Sauve car hit the Francis car before the Francis car hit the Ratliff car. In addition, Ratliff testified when called by plaintiffs under Code of Civil Procedure section 2055 that he heard a crash behind him before his car was involved and then another crash at which time his car was struck. On subsequent examination by Sauve's counsel, Ratliff's counsel stipulated that Ratliff had testified in his deposition that Francis, after getting

---

[4]Defendant cites *Conway* v. *Hudspeth* (1958) 229 Ark. 735 [318 S.W.2d 137] which upheld the trial court's refusal to admit testimony of a police officer relative to the order of impact in a three-car collision (two cars proceeding in the same direction and the third in the opposite direction). It was stated that courts look with disfavor on attempts to reconstruct accidents, citing *Moniz* v. *Bettencourt, supra,* 24 Cal.App.2d 718. The court held that "[i]n the absence of anything to indicate that it was beyond the jurors' ability to understand the facts and draw their own conclusions, there was no need to resort to expert opinion." (P. 140 [318 S.W.2d].) However, it is to be noted that in *Little* v. *George Feed & Supply Co.* (1961) 233 Ark. 78 [342 S.W.2d 668, 672], the same court, referring to the *Conway* case stated: "We do not unequivocally hold 'reconstruction' of an accident by an expert to be inadmissible when supported by proper evidentiary facts...."

out of the latter's car, had blamed Ratliff for the accident and for stopping suddenly. Since independent and competent evidence to substantially the same effect from other witnesses was placed before the jury, the erroneous admission of cumulative evidence such as the officer's opinion in the instant case could not have been prejudicial. (*Kalfus* v. *Fraze, supra,* 136 Cal.App.2d 415, 423; *Zelayeta* v. *Pacific Greyhound Lines, supra,* 104 Cal.App.2d 716, 723.)

3. *Sufficiency of plaintiffs' medical evidence to support the verdict.*

Defendant challenges the sufficiency of plaintiffs' medical testimony to support the implied finding of the jury that the accident was a proximate cause of Francis' death.

Plaintiffs' medical expert, Dr. Rodgers, testified that he treated the decedent since October 1956 for high blood pressure; that although decedent was hospitalized for a stroke in April 1957, he suffered no permanent effects of paralysis or physical disability and after his discharge from the hospital "his course was very good" and "he was active, working and ... doing quite well"; that on November 15, 1957, the day following the accident he examined the decedent and diagnosed his injury as a "whiplash type of injury or sprain to the neck"; and that he noticed a change in the decedent's condition following the accident.[5]

On direct examination, the doctor gave his opinion that the accident had a "contributing connection" with decedent's death.[6] He explained the basis of his opinion by stating that the accident and its attendant pain, consternation and lack of security, had disrupted the decedent's prior satisfactory status and had played a role in his death.[7]

---

[5] "... from the time he was injured he developed the pain and the limitation, and increased concern that came with the accident, he didn't do as well. He was worried and he was in pain with headache and less secure of himself; his whole feeling of security, of being on top of the world, of being better had suddenly begun to evaporate; and this change occurred in him at that time."

[6] "Q. Doctor, would you tell us in your opinion, did the accident of November 14, 1957 have any contributing connection with the death of Mr. Francis? A. Yes, I believe it did."

[7] "I believe that the changes that occurred in the arteries and the general status due to hypertension were certainly there, and the affect [*sic*] on the blood vessels were there, as much as a stream wearing away a bank is there; but the man was doing well, and with the blood pressure and his general status controlled, and the tension of his life reduced, he I think clinically was what could be considered to be in a satisfactory status. And then the pain and consternation and the general

On cross-examination Dr. Rodgers repeated that the decedent's general upset condition was a contributory factor in his fatal hemorrhage.[8] He stated, on further inquiry, that this condition was obvious to him.[9] He acknowledged on cross-examination that he signed Francis' death certificate on which he had entered as the "disease or condition directly leading to death," the words "Subarachnoid hemorrhage"; and as "antecedent causes" that death was due to "Rupture of Circle of Willis" due to "Malignant essential hypertension." The *interval between the onset of the hypertension and death* was entered as "yr" (i.e., a year). During cross-examination, the witness thereupon reaffirmed that in a medical report to plaintiffs' counsel he had stated *inter alia* that it was impossible for him to say that the decedent might not have had a subarachnoid hemorrhage, had the accident not occurred or that "those occurrences were not strictly a matter of chance occurrence."

On redirect examination, Dr. Rodgers acknowledged that immediately after the last mentioned statements, he also stated in the above-mentioned letter that he was convinced that the decedent's discomfort and consternation resulting from the accident were contributory to the hemorrhage.[10]

---

lack of security, as I mentioned, with all the firm things that had been developing in his life, such as a job and earning money, with all of this being put into jeopardy, and as I say, his security evaporating, the general status of tensions of the body and his system could easily have promoted an artery to wear and then rupture, when it would not have for an indefinite period of time had he not been injured. So I feel that the accident and its attendant pain and disruption of him did play a role in his eventual death."

[8] "I don't think I could say this whiplash caused his death. I think that in some—and to a very difficult degree of measure—I could certainly be as wrong as I could be right, but I think something in terms of the general upset of this man's status had a contributory factor to his subarachnoid hemorrhage."

[9] "I knew this man extremely well, and just as I can't tell you right now what your heart rate is and can't measure it here, I knew this man when he walked into my office with this pain in his neck, that he was upset and he was really upset; and although he didn't admit to it, and although nothing that he was doing was changed in the sense that he went about his little duties and kept this up right up to the day of his death, he kept this itemized measure of his blood pressure ... right up to the last, he was doing what he was told to do, but he was doing it with terrific overhead of pain and just being shaken. This is what has happened to him."

[10] "However, I am convinced in my own mind that the discomfort and consternation which were introduced into this man's life by this accident

In our opinion the foregoing evidence is supportive of the verdict. Defendant argues, on the other hand, that Dr. Rodgers' testimony does not establish that the causal link between the accident and the fatal hemorrhage was *probable* but only that it was *possible,* and that therefore such testimony is conjectural and insufficient to sustain the recovery. It is settled, as defendant's cited cases illustrate, that a recovery based solely upon evidence tending to prove only a possibility of one event being the proximate cause of another is based on mere surmise or conjecture and cannot be sustained. (See *Travelers Ins. Co.* v. *Industrial Acc. Com.* (1949) 33 Cal.2d 685, 687 [203 P.2d 747] ; *Pacific Employers Ins. Co.* v. *Industrial Acc. Com.* (1960) 182 Cal.App.2d 162, 165-166 [5 Cal.Rptr. 738].) Nevertheless ''[m]edical witnesses need not testify positively to support a finding of proximate cause. Their opinion of the probabilities is sufficient for that purpose.'' (*Robison* v. *Leigh* (1957) 153 Cal.App.2d 730, 732 [315 P.2d 42].)

In the instant case Dr. Rodgers testified that the accident had a contributing connection with the decedent's death. He described the ''satisfactory status'' of the decedent immediately prior to the accident and the change occurring in the decedent after the accident. This change was evidenced by pain, worry, ''consternation,'' and general lack of security. The decedent's ''satisfactory status'' was replaced by a ''general status of tensions.'' These statements embraced facts observed by the witness as the decedent's attending physician. While the witness' statement that the decedent's tensions ''could easily have promoted'' the rupture of the artery might appear to be framed in terms of ''possibility,'' his statement immediately following to the effect that such condition of the decedent ''*did* play a role in his eventual death'' (italics added) reflects no tone of guess or speculation. It is a direct and positive assertion similar to the witness' preceding opinion (see footnote 6, *ante*) that the accident *did* have a contributing connection with the death.

were contributory to the terminal episode which occurred. I conclude this because prior to the accident he was doing quite well. On his periodic visits to my office he was free of symptoms, cooperative as was his usual way, and generally cheerful. From the time of the accident, though he tended to minimize his discomfort and inconvenience this caused, he was a different person. Though he did not wish to minimize his discomforts, and this was true of his report of symptoms during the entire period of my knowledge of him, there was no question but that he was disturbed by the discomfort he felt.''

In much the same way, Dr. Rodgers on cross-examination gave his opinion that the decedent's general upset condition *"had* a contributory factor" (italics added) to his hemorrhage (see footnote 8, *ante*). These assertions are not cast in language indicating surmise or possibility. Despite the fact that the witness did not always use categorical language, the essence of his testimony considered as a whole was an opinion that the connection between the accident and the death was probable rather than merely possible. We think that the jury could have reasonably concluded that, in the witness' opinion, the pain, worry, consternation and general tensions of the decedent probably resulted from the accident and in turn probably contributed to the hemorrhage and death.

Defendant's medical witness, Dr. Carr, a pathologist, testified that he had never personally seen the decedent, dead or alive; that his testimony was based exclusively on certain written records, including hospital records and the record of blood pressure readings taken by the decedent personally; that there was no significant difference in the decedent's blood pressure between the time of the accident and the time of his death; that an emotional upset resulting from a whiplash injury would be evidenced by a rise in blood pressure; that the decedent did not have enough emotional upset to raise his blood pressure; that the fatal rupture of the decedent's artery could only result from an emotional upset if there were a rise in the blood pressure; and that the cause of decedent's death was "arteriosclerosis and degenerative arterial disease that gradually weakened one of these areas and it wouldn't hold the blood pressure inside, so it blew out."

Dr. Carr's testimony merely created a conflict in the evidence bearing on the issue of proximate cause. Generally speaking, the law makes no distinction between expert testimony and evidence of other character. (*Treadwell* v. *Nickel* (1924) 194 Cal. 243, 263 [228 P. 25].) ██ It is within the exclusive province of the trier of fact to determine the credibility of experts and the weight to be given to their testimony. (*Estate of Blake* (1902) 136 Cal. 306, 309 [68 P. 827, 89 Am.St.Rep. 135]; *People* v. *Loop* (1954) 127 Cal. App.2d 786, 800 [274 P.2d 885]; *Natural Soda Products Co.* v. *City of Los Angeles* (1952) 109 Cal.App.2d 440, 443 [240 P.2d 933].) ██ Where there is conflicting expert evidence, the determination of the trier of fact as to its weight and value and the resolution of such conflict are not subject to review on appeal. (*Barker* v. *Gould* (1898) 122 Cal. 240,

243-244 [54 P. 845]; *Ideal Packing Co. v. Brice* (1955) 132 Cal.App.2d 582, 585 [282 P.2d 957]; *Natural Soda Products Co. v. City of Los Angeles, supra; Lewith v. Rehmke* (1935) 10 Cal.App.2d 97, 102-103 [51 P.2d 476].) Such determination is had when the trier of fact accepts the proof presented by an expert on one side of the case and rejects that presented by an expert on the other side. (*Ideal Packing Co. v. Brice, supra.*)

In essence, Dr. Rodgers' opinion was that the decedent's general tensions and upset condition resulting from the accident were a contributing factor in his hemorrhage and death. Dr. Carr's opinion, on the other hand, was that they had nothing to do with decedent's death, which was caused solely by arteriosclerosis. The latter expert excluded the decedent's upset condition because it was not accompanied by a rise in blood pressure. Defendant argues that Dr. Carr's testimony relating to the blood pressure factor is an uncontradicted opinion which cannot be ignored in the case, citing *Wirz v. Wirz* (1950) 96 Cal.App.2d 171 [214 P.2d 839, 15 A.L.R.2d 1129] and *Krause v. Apodaca* (1960) 186 Cal. App.2d 413 [9 Cal.Rptr. 10]. We disagree. This was merely a reason given by the physician in support of his ultimate opinion as to the cause of the death. (Code Civ. Proc., § 1872; 2 Wigmore, Evidence (3d ed. 1940) § 562, p. 644.) It was a part of the argument made by the witness for the acceptance of his opinion, expert evidence being actually an argument of the expert to the court or jury. (*People v. Martin* (1948) 87 Cal.App.2d 581, 584 [197 P.2d 379].) The basic issue confronting the experts here was the cause of Francis' death. On this issue their opinions were fundamentally and inherently in conflict. Actually this conflict permeated the underlying reasons for the respective opinions, Dr. Rodgers' opinion contradicting Dr. Carr's testimony on the blood pressure feature by holding to the thesis that the decedent's upset condition observed by the witness contributed to his death despite the absence of any rise in blood pressure.

4. *Evidence concerning decedent's life expectancy.*

Defendant complains that plaintiffs produced no evidence of the decedent's life expectancy but left the question entirely to the jury's speculation. We note that the court instructed the jury that in determining pecuniary loss they should consider *inter alia* the age, state of health and respective life expectancies of the deceased and each plaintiff but should be concerned only with "the shorter of the life ex-

pectancies, that of one of the plaintiffs or that of the deceased. . . ." This was a correct statement of the law (*Redfield* v. *Oakland Consolidated Street Ry. Co.* (1895) 110 Cal. 277, 287 [42 P. 822, 1063]) and no objection is raised thereto. However *no* instruction was requested or given advising the jury that they might consider evidence of the respective life expectancies of the deceased and the plaintiffs as set forth in specified mortality tables in common use (see BAJI No. 177 revised). Nevertheless it is to be noted that defendant raises no objection to the life expectancies of the plaintiffs but only to that of the decedent.

In an action for wrongful death, the jury may award such damages "as under all the circumstances of the case, may be just . . . ." (Code Civ. Proc., § 377.) ▮ As we have pointed out among the circumstances to be considered in awarding such damages are the respective life expectancies of the decedent and the statutory beneficiaries. (*Redfield* v. *Oakland Consolidated Street Ry. Co., supra,* 110 Cal. 277, 287; *Valente* v. *Sierra R. Co.* (1907) 151 Cal. 534, 542-543 [91 P. 481].) Mortality tables are admissible to assist the jury but they are not indispensable. (*Dallas* v. *De Yoe* (1921) 53 Cal.App. 452, 457 [200 P. 361]; *Atchison, T. & S. F. Ry. Co.* v. *Hughes* (1895) 55 Kan. 491 [40 P.919, 923].) It has been held, for example, that, absent mortality tables, the trier of fact may still approximate the life expectancy of a statutory beneficiary who appeared in court. *Kawamura* v. *Honek* (1932) 127 Cal.App. 509, 511 [16 P.2d 150]; *Rickards* v. *Noonan* (1940) 40 Cal.App.2d 266, 274 [104 P.2d 839].) In *Dallas* v. *De Yoe, supra,* the court applied this rule to the decedent, although it indulged in the presumption "that a person is in average normal health, in the absence of evidence to the contrary." ▮ We think that the principle enunciated by these cases is that the question of life expectancy is a factual one for the jury and that in the absence of mortality tables they may evaluate this factor on the basis of the evidence in the record. All of this evidence is weighed by the jury in determining "such damages . . . as under all the circumstances of the case, may be just" (Code Civ. Proc., § 377) which statutory rule is the only measure of damages in such cases. (*Bond* v. *United Railroads* (1911) 159 Cal. 270 276 [113 P. 366, Ann.Cas. 1912C 50, 48 L.R.A. N.S. 687]; *Dallas* v. *De Yoe, supra.*)

▮ In the instant case, the decedent was 47 years old at the time of the accident. The jury had before them extensive

testimony concerning his medical history and condition. As we have already set forth, Dr. Rodgers testified to his general satisfactory status immediately before the accident. Although he did not give any estimate of the decedent's life expectancy, he did testify that Francis was "doing well" (see footnote 7, *ante*), that there was nothing about his condition before the accident to indicate that a fatal stroke was imminent, and that he "had every reason to believe he was going to go on quite a while, because he was doing so well." The jury was entitled to consider all of this evidence for the purpose of approximating the decedent's life expectancy.

5. *Alleged abandonment of plaintiffs' theory of proximate cause.*

Plaintiffs alleged in their complaint "that as a direct and proximate result of said collision, there was inflicted upon the person of said decedent, ROBERT JOSEPH FRANCIS, Sr., very serious personal injuries, and as a result if [*sic*] said injuries, said ROBERT JOSEPH FRANCIS, Sr., Deceased, died on or about the 1st day of December, 1957." Their proof showed that the collision caused personal injuries which produced pain, worry, tensions and an upset condition, all of which in turn contributed to the decedent's death. Defendant contends this constituted a failure of proof. We disagree. As both pretrial orders made clear, the pertinent issue was whether the accident proximately caused decedent's death. Plaintiffs' proof on this issue, summarized above, was merely a particularization of their pleading. The consequences of the collision thus established followed in an unbroken sequence from the effect of defendant's original wrongful act on the decedent's condition existing at the time without the intervention of any external forces. The accident was therefore a proximate cause of the death within the recognized definition of "proximate cause." (*Merrill* v. *Los Angeles Gas & Elec. Co.* (1910) 158 Cal. 499, 503 [111 P. 534, 139 Am.St.Rep. 134, 31 L.R.A. N.S. 559]; *Great Western Power Co.* v. *Pillsbury* (1915) 171 Cal. 69, 70 [151 P. 1136, L.R.A. 1916A 281]; *Bethlehem Shipbuilding Corp.* v. *Industrial Acc. Com.* (1919) 181 Cal. 500, 502-505 [185 P. 179, 7 A.L.R. 1180]; see Prosser, Law of Torts, pp. 258, 262.) Stated another way, since plaintiffs proved that the death was a proximate consequence of the tensions and stress produced by the decedent's injuries, they proved that it was a proximate consequence of the injuries themselves, the chain of causation being continuous and unbroken.

6. *Alleged error in giving instruction on due care.*

 The court instructed the jury on the presumption of the exercise of ordinary care by the decedent at the time of the accident.[11] Defendant contends that this was error because the decedent in effect testified through Officer Haase who recounted Francis' statement admitted as part of the res gestae (see heading No. 1, *ante*) that he was stopped for about· a second when struck. In his closing brief, defendant concedes that his contention represents what he thinks the law ought to be rather than what it is.

"While under some circumstances there is no room for the presumption where the party whose claimed negligence is at issue either himself testifies or introduces evidence in his own behalf as to his acts and conduct immediately preceding and at the time of the accident [citations], the benefit of the presumption is available if such person be deceased and the testimony of plaintiffs' witnesses ·respecting the deceased's acts and conduct at the time involved is not 'wholly irreconcilable' with such presumption." (*Brandelius* v. *City & County of San Francisco* (1957) 47 Cal.2d 729, 736 [306 P.2d 432]. See also *Scott* v. *Burke* (1952) 39 Cal.2d 388, 394 [247 P.2d 313]; *Gigliotti* v. *Nunes* (1955) 45 Cal.2d 85, 92-93 [286 P.2d 809]; *Johnson* v. *Nicholson* (1958) 159 Cal.App. 2d 395, 409-410 [324 P.2d 307]; *Norton* v. *Futrell* (1957) 149 Cal.App.2d 586, 588-589 [308 P.2d 887].)

No claim is or could be made in the instant case that plaintiffs' evidence is irreconcilable with the presumption. The independent witness, Shook, testified that the decedent Francis was stopped when struck by the defendant. Officer Haase testified to the decedent's statement to the same effect, which we have concluded was erroneously admitted in evidence. Defendant argues without any citation of authority in point that the admission of the decedent's res gestae declaration makes the presumption unavailable. This is contrary to the rule declared by the above authorities. The presumption is operative if the person whose acts and conduct are in issue is dead even though other persons testify to the facts of the accident unless their testimony is wholly irreconcilable with the presumption. If these conditions are met, the presumption does not cease to be operative because such other witnesses testify, among other things, to declarations of the decedent. (See *Graf* v. *Garcia* (1953) 117 Cal.App.2d 792, 796-

---

[11]The court gave BAJI No. 135A revised, which need not be set forth herein.

797 [256 P.2d 995]¹².)

*7. Alleged error in giving instruction on funeral expenses.*
Defendant contends that the court erred in instructing the jury to compensate plaintiffs for funeral expenses[13] as there was no evidence that such expenses were in fact incurred.

On the recall of Mrs. Francis, plaintiffs offered in evidence the funeral bill identified by the witness as having been incurred in connection with the accident. Upon objection by defendant,[14] the court reserved its ruling. So far as the instant record discloses, no ruling was ever made and the bill was never admitted in evidence. It is not among the exhibits brought before us. It does not even appear to have been marked for identification. The record is silent as to the details or amount of the bill.

In an action for wrongful death, the beneficiaries are entitled to recover the reasonable value of funeral expenses paid or incurred by them. (*Adams* v. *Southern Pacific Co.* (1935) 4 Cal.2d 731, 743 [53 P.2d 121].) While plaintiffs sought to introduce the funeral bill in evidence, the record does not disclose any attempt on their part to offer additional evidence of the reasonableness of the bill nor does it disclose that the parties stipulated to the reasonableness of the bill. Although plaintiffs showed that the bill was attributable to the accident and although it appears to have been necessary, it was still incumbent upon plaintiffs to show that the charges were reasonable. (Cf. *Gimbel* v. *Laramie* (1960) 181 Cal.App.2d 77, 81 [5 Cal.Rptr. 88].) Nevertheless the amount paid or incurred is some evidence of reasonable value and, in the absence of contradictory evidence, is sufficient to support an award. (*Dewhirst* v. *Leopold* (1924) 194 Cal. 424, 433 [229 P. 30] ; *Malinson* v. *Black* (1948) 83 Cal.App.2d

¹²Overruled on other grounds in *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 624 [327 P.2d 897].

¹³The instruction in pertinent part stated: ''Also, you shall include in your award an amount that will compensate for whatever reasonable expense was paid out or incurred by plaintiffs or any of them for funeral services in memory of the decedent and for burial of the body. In determining that amount, you shall consider the decedent's station in life and the financial condition of the estate, as these circumstances might have been shown to you. (Plaintiff's Instruction No. 42.) ''

¹⁴Defendant objected ''on the same grounds.'' While the meaning of this is not entirely clear, it appears to incorporate a previous objection to other bills on the ground that no issue of special damages was stated in the pretrial conference order. However we note that the complaint alleges it was necessary to employ a funeral director, leave being asked to insert the amount of the bill. We find no amendment in this respect.

375, 380 [188 P.2d 788].) We conclude therefore that the court erred in not admitting the bill. ▇▇▇ Since the court's action was induced by defendant's objection, defendant should not now be permitted to take advantage of his erroneous position and is estopped to claim error in plaintiffs' failure to prove that funeral expenses were incurred. (*Watenpaugh* v. *State Teachers' Retirement System* (1959) 51 Cal.2d 675, 680 [336 P.2d 165]; *Credit Clearance Bureau* v. *Guaranty Loan Co.* (1923) 61 Cal.App. 528, 530 [215 P. 104]; *Merrill* v. *Kohlberg* (1916) 29 Cal.App. 382, 386 [155 P. 824]; 3 Witkin, Cal. Procedure, p. 2258.)

▇▇▇ Quite apart from the above consideration, defendant could not have been prejudiced by the instruction. The jury were told to include in their award "*whatever* reasonable expense was paid out or incurred...." (Italics added.) There was no evidence of any such expense. It is presumed that the jury properly applied the instruction to the evidence before them and therefore that they made no award for funeral expenses, if no evidence on the subject was presented. (48 Cal.Jur.2d 193.)

8. *Admission of X-ray bill in evidence.*

▇▇▇ Finally defendant contends that the court erred in admitting in evidence a bill for X-rays taken of the decedent before his death. While the record does not disclose the purpose for which the bill was offered, the bill was relevant as showing the decedent's treatment after the accident. Defendant's main complaint is that such expenses are not recoverable in the instant action and that admission of the bill "may have planted in the jurors' minds that recovery of medical expenses was proper...." However the court correctly instructed the jury as to the damages they might award. Nowhere did the court expressly or by implication tell the jury that they could include in their award the amount of X-ray bills or for that matter any expenses incurred by the decedent before his death. It can be presumed that the jury followed the court's instructions.

Defendant also appeals from the order denying his motion for a new trial.

The attempted appeal from the order denying defendant's motion for a new trial is dismissed. The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied December 3, 1963, and appellant's petition for a hearing by the Supreme Court was denied December 30, 1963.