[No. S138382. Nov. 26, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES GIORDANO, Defendant and Appellant.

646

## COUNSEL

Diane Nichols, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, Steve Oetting and James D. Dutton, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—Defendant was convicted of vehicular manslaughter and sentenced to a prison term of four years. He was ordered to pay direct victim restitution to the wife of the deceased victim in the amount of $167,711.65, the value of five years of the deceased victim's average annual earnings. We here consider whether Penal Code section 1202.4, governing direct victim restitution, authorizes a court to require a convicted defendant to compensate the spouse of a deceased victim for his or her future economic losses attributable to the deceased victim's death. We hold that a court may include this loss of economic support in a direct restitution order.

We also consider how a trial court should measure a surviving victim's economic loss. We articulate several factors that a trial court may consider when calculating how much restitution is owed to a surviving victim.

Because defendant has not shown that the amount of restitution ordered was an abuse of the trial court's discretion, we affirm the judgment of the Court of Appeal.

## I. FACTS AND PROCEDURAL BACKGROUND

On or about December 1, 2003, defendant Charles Giordano was driving under the influence of alcohol when he hit and killed Kenneth Armstrong, who was riding a motorcycle. On December 18, 2003, defendant pleaded guilty to vehicular manslaughter (Pen. Code, § 192, former subd. (c)(3), as amended by Stats. 1998, ch. 278, § 1), and admitted having suffered a prior conviction for driving under the influence of alcohol (Veh. Code, § 23152, subd. (b)). Pursuant to his plea agreement, defendant was denied probation, sentenced to the upper term of four years in prison, and ordered to pay a restitution fine of $400.

On May 5, 2004, decedent's surviving spouse, Patricia Armstrong, requested a hearing for victim restitution pursuant to Penal Code section 1202.4, subdivision (a)(3)(B). On July 23, 2004, the trial court held a restitution hearing, during which Patricia Armstrong, represented by private counsel, sought "appropriate restitution to cover . . . some of her expenses that she ha[d] incurred [since] the primary support she depended on at the time of her marriage was taken away due to the crime of [defendant]." She did not seek "such things that you would ask for in a wrongful death [action]," but instead requested restitution "in the amount of a very modest life insurance policy in the amount of $25,000 to $50,000, based on the decedent's modest earnings of approximately $35,000 per year."

Decedent's employer and Patricia Armstrong were the only witnesses who testified at the hearing. Decedent's employer testified that he had employed decedent for nine years as a superintendent in his roofing business. Decedent's W-2 federal income tax forms showed that he had earned $38,940, $29,131, and $32,546 in 2001, 2002, and 2003, respectively. Patricia Armstrong testified that she and decedent were married for eight years and that decedent "was a provider" for their family. For the last two years of their marriage, she worked as a housekeeper. The court ordered defendant to pay restitution to Patricia Armstrong in the amount of $167,711.65, which was calculated by multiplying decedent's approximate average annual earnings over the three years prior to his death by five years.

Defendant appealed the trial court's restitution order, contending that the order violated his original plea agreement and that the Penal Code does not authorize direct restitution to the surviving spouse of a deceased victim based upon the loss of decedent's future earnings. The Court of Appeal affirmed

defendant's sentence as modified by the restitution order. It agreed with the trial court's determination that Penal Code section 1202.46 granted the trial court jurisdiction to consider the request for restitution seven months after defendant was sentenced.[1] The Court of Appeal concluded that decedent's spouse was a "victim" under Penal Code section 1202.4, subdivision (k), for purposes of receiving victim restitution, and that she was entitled to recover decedent's lost future earnings. The court reasoned that she "clearly suffered a loss as a result of defendant's criminal activity, including the loss of income her husband would have earned, and she was therefore entitled to any wages decedent may have otherwise earned."

We granted review in order to determine (1) whether California's direct restitution scheme, as set forth in article I, section 28 of the California Constitution and Penal Code section 1202.4, authorizes restitution to compensate the spouse of a deceased victim for his or her future economic losses, and (2) how a trial court should measure a surviving victim's economic loss.

## II. DISCUSSION

### A.

We begin by providing an overview of, and describing the history and evolution of, the state's restitution scheme.

Convicted criminals may be required to pay one or more of three types of restitution. First, absent "compelling and extraordinary reasons," all convicted defendants must pay a "restitution fine," the amount of which is "set at the discretion of the court and commensurate with the seriousness of the offense." (Pen. Code, § 1202.4, subd. (b).)[2] Restitution fines are paid into the Restitution Fund in the State Treasury (Pen. Code, § 1202.4, subd. (e)), which is used to compensate victims for specified "pecuniary losses they suffer as a direct result of criminal acts." (Gov. Code, § 13950, subd. (a).) Second, when a defendant is convicted of a crime involving a victim who "has suffered economic loss as a result of defendant's conduct" (Pen. Code, § 1202.4, subd. (f)), the court must require the defendant to pay full restitution directly to the victim or victims of the crime "unless it finds compelling

---

[1] Defendant does not challenge the Court of Appeal's conclusion that the trial court had jurisdiction to impose additional restitution. (Pen. Code, § 1202.46 ["[W]hen the economic losses of a victim cannot be ascertained at the time of sentencing pursuant to subdivision (f) of Section 1202.4, the court shall retain jurisdiction over a person subject to a restitution order for purposes of imposing or modifying restitution until such time as the losses may be determined."].)

[2] For felonies, the restitution fine must be at least $200, but not more than $10,000. (Pen. Code, § 1202.4, subd. (b)(1).) For misdemeanors, the fine must be at least $100, but not more than $1,000. (*Ibid.*)

and extraordinary reasons for not doing so, and states those reasons on the record." (*Id.*, subd. (g).) A "defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution." (*Id.*, subd. (f)(1).) Third, when a defendant is granted probation, a court may in its discretion require the defendant to pay restitution as a condition of probation. (Pen. Code, § 1203.1, subds. (b), (j); *People v. Lent* (1975) 15 Cal.3d 481, 486–487 [124 Cal.Rptr. 905, 541 P.2d 545] (*Lent*).)

■ In 1982, California voters passed Proposition 8, also known as The Victims' Bill of Rights. At the time this initiative was passed, victims had some access to compensation through the Restitution Fund, and trial courts had discretion to impose restitution as a condition of probation. (*People v. Broussard* (1993) 5 Cal.4th 1067, 1072 [22 Cal.Rptr.2d 278, 856 P.2d 1134] (*Broussard*); *People v. Birkett* (1999) 21 Cal.4th 226, 235, fn. 8 [87 Cal.Rptr.2d 205, 980 P.2d 912] (*Birkett*).) Proposition 8 established the right of crime victims to receive restitution directly "from the persons convicted of the crimes for losses they suffer." (Cal. Const., art. I, § 28, subd. (b).) The initiative added article I, section 28, subdivision (b) to the California Constitution: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer. [¶] Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary."

California Constitution, article I, section 28, subdivision (b), which is not self-executing, directed the Legislature to adopt implementing legislation. (*Broussard, supra*, 5 Cal.4th at p. 1078 (dis. opn. of Panelli, J.); *People v. Vega-Hernandez* (1986) 179 Cal.App.3d 1084, 1092–1099 [225 Cal.Rptr. 209] (*Vega-Hernandez*).) We have observed that "[t]he Legislature has enacted, and frequently amended, a bewildering array of responsive statutes." (*Birkett, supra*, 21 Cal.4th at p. 228.) We briefly review the evolution of these statutes, as relevant to the issue before us.

In 1983, the Legislature enacted Penal Code section 1203.04, which "require[d] courts to impose restitution as a condition in all cases in which probation is granted." (*People v. Narron* (1987) 192 Cal.App.3d 724, 732 [237 Cal.Rptr. 693].) The Legislature also enacted Penal Code section 1202.4, requiring "the court to impose a restitution fine '[in] any case in which a defendant is convicted of a felony . . . .' " (*Narron, supra*, 192 Cal.App.3d at p. 732, fn. 4.) The Legislature, however, did not immediately "enact legislation either requiring or authorizing trial courts to order defendants who were convicted of crimes but were *not* given probation to make restitution to any

of the victims of their crimes." (*Broussard, supra*, 5 Cal.4th at p. 1073.) In 1986, the Legislature remedied this oversight by amending Government Code section 13967 to provide "that when 'a victim has suffered economic loss as a result of the defendant's criminal conduct, and the defendant is denied probation, . . . the court shall order restitution to be paid to the victim.' " (*Broussard*, at p. 1074, italics omitted.)

In the mid-1990's, the Legislature consolidated much of the state's victim restitution scheme into Penal Code section 1202.4. In 1994, the Legislature deleted the restitution provisions in Government Code section 13967, including the provision for restitution payments by defendants who are denied probation, and incorporated substantively similar provisions into Penal Code section 1202.4. (Stats. 1994, ch. 1106, §§ 2, 3, pp. 6548–6550, eff. Sept. 29, 1994.) In 1995, the Legislature repealed Penal Code section 1203.04, which had provided for restitution payments as a condition of probation, and incorporated its requirements into Penal Code section 1202.4. (Stats. 1995, ch. 313, §§ 5, 8, pp. 1755–1758, 1762, eff. Aug. 3, 1995.) Penal Code section 1202.4 now requires restitution in every case, without respect to whether probation is granted. In addition, as noted above, Penal Code section 1203.1, subdivision (j) provides broader discretion for trial courts to impose restitution as a condition of probation.

The 1994 amendments to Penal Code section 1202.4 were enacted "to expand the ability of the victims to receive restitution, both directly and from the restitution fund." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 3169 (1993–1994 Reg. Sess.) as amended Apr. 4, 1994, p. 1.) Penal Code section 1202.4, subdivision (h) provided that a restitution order "shall be enforceable as a civil judgment." (Stats. 1994, ch. 1106, § 3, pp. 6548, 6549, eff. Sept. 29, 1994.) Penal Code section 1202.4, subdivision (k) defined "victim" to "include the immediate surviving family of the actual victim." (Stats. 1994, ch. 1106, § 3, pp. 6548, 6549, eff. Sept. 29, 1994.) In 1999, the Legislature amended the definition of "victim" in Penal Code section 1202.4, subdivision (k)(3) to include " '[d]erivative victims' as defined in Section 13960 of the Government Code." (Stats. 1999, ch. 584, § 4.) At the time, the definition of "derivative victims" in Government Code section 13960 included a person who "[a]t the time of the crime was the parent, sibling, spouse, or child of the victim." (Gov. Code, § 13960, former subd. (a)(2)(A), as amended by Stats. 1998, ch. 697, § 1, repealed by Stats. 2002, ch. 1141, § 10, and reenacted without substantive change as Gov. Code, § 13955, subd. (c) by Stats. 2002, ch. 1141, § 4.)[3]

---

[3] In 2004, the definition of "victim" found in Penal Code section 1202.4, subdivision (k) was amended (Stats. 2004, ch. 223, § 2) to incorporate the persons identified as "derivative victims" in Government Code former section 13960, without substantive change.

As amended in 1994, Penal Code section 1202.4, former subdivision (g) specified that restitution payments "shall . . . be of a dollar amount that is sufficient to fully reimburse the victim or victims, for every determined economic loss incurred as the result of the defendant's criminal conduct, including all of the following:" (1) the value of stolen or damaged property; (2) medical expenses; (3) lost wages or profits due to a victim's injury or time spent caring for a minor victim; (4) lost wages or profits due to time spent as a witness. (Stats. 1994, ch. 1106, § 3, pp. 6548, 6549, eff. Sept. 29, 1994.) In 1996, the Legislature redesignated this provision as subdivision (f) and amended it to specify that the list of categories is nonexclusive. The relevant clause now states: "including, *but not limited to*, all of the following." (Pen. Code, § 1202.4, subd. (f)(3), italics added; Stats. 1996, ch. 629, § 3, pp. 3465, 3467, eff. Jan. 1, 1997.) Additionally, the list of categories in subdivision (f) was expanded to include three additional categories of loss: (1) noneconomic losses for felony convictions for lewd or lascivious acts (Pen. Code, § 288), (2) interest on the economic loss, and (3) attorney fees and costs of collection. (Stats. 1996, ch. 629, § 3, pp. 3465, 3467–3468, eff. Jan. 1, 1997.) In 1999, the Legislature again amended the nonexclusive list of categories of compensable loss in subdivision (f), expanding it to include: (1) mental health counseling expenses, (2) relocation expenses, (3) residential security expenses, and (4) the cost of retrofitting a vehicle or residence due to the disability of a victim attributable to the crime. (Stats. 1999, ch. 584, § 4.) The most recent amendment to this list, made in 2000 to subdivision (f)(3)(D) and (E), specifies that "[w]ages or profits lost," due to a victim's injury, time spent caring for a minor victim, or time spent as a witness, includes "any commission income as well as any base wages." (Stats. 2000, ch. 1016, § 9.5.)

In 2000, the Legislature also amended Penal Code section 1202.4 to provide that assistance paid to a victim out of the Restitution Fund "shall be presumed to be a direct result of the defendant's criminal conduct and shall be included in the amount of the restitution ordered." (Pen. Code, § 1202.4, subd. (f)(4)(A) (added by Stats. 2000, ch. 1016, § 9.5).) If a victim has received compensation from the Restitution Fund, the defendant must pay the amount thus compensated to the Restitution Fund rather than to the victim. (Pen. Code, § 1202.4, subd. (f)(2).)

In December, 2003, when defendant hit and killed decedent, the version of Penal Code section 1202.4 enacted in 2000 was still in effect.[4]

---

[4] Since 2000, the Legislature has made modifications to Penal Code section 1202.4 that do not relate to the issue before us in this case. (See Stats. 2004, ch. 223, § 2; Stats. 2005, ch. 238, § 1; Stats. 2005, ch. 240, § 10.)

## B.

As we have observed, "the Legislature is under an express constitutional mandate (Cal. Const., art. I, § 28, subd. (b)) to enact laws requiring trial courts to order restitution 'in every case . . . in which a crime victim suffers a loss . . . .' " (*Broussard, supra,* 5 Cal.4th at p. 1075.) Our interpretation of this constitutional mandate is guided by the principle of construction that " '. . . since a written constitution is intended as and is the mere framework according to whose general outlines specific legislation must be framed and modeled, and is therefore . . . necessarily couched in general terms or language, it is not to be interpreted according to narrow or supertechnical principles, but liberally and on broad general lines, so that it may accomplish in full measure the objects of its establishment and so carry out the great principles of government.' " (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 244–245 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador Valley*), quoting *Stephens v. Chambers* (1917) 34 Cal.App. 660, 663–664 [168 P. 595].)

Although we are guided by the broad constitutional mandate of California Constitution, article I, section 28, subdivision (b), that restitution must been imposed "in every case . . . in which a crime victim suffers a loss . . . ," the scope of the losses that must be compensated is not clear from the text of this constitutional provision. Instead, it requires generally that "all persons who suffer *losses* as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for *losses* they suffer," but does not define "losses." (Cal. Const., art. I, § 28, subd. (b), italics added; see *Vega-Hernandez, supra,* 179 Cal.App.3d at pp. 1096–1097.) The history of Proposition 8 does not indicate that the voters considered the precise contours of the losses that must be included in a restitution order. As we have observed, "[t]he ballot arguments for and against the measure scarcely mentioned restitution. Proponents argued that Proposition 8, in all its aspects, was a necessary means of curbing crime, particularly violent crime, and of restoring balance between the rights of criminals and victims. [Citation.] Opponents responded that Proposition 8 was radical and would undermine better considered reforms already in place. [Citation.] On the issue of restitution, the opponents urged only that the proposed new right to restitution was 'meaningless' because 'so many victims are harmed by criminals who can't pay,' and 'victims already have the right to collect from criminals who can pay.' [Citation.]" (*Birkett, supra,* 21 Cal.4th at p. 244, italics omitted.)

Because the scope of losses in California Constitution, article I, section 28, subdivision (b) is ambiguous, we look to the statutes the Legislature has enacted to implement this constitutional provision. "[I]t is well settled that when the Legislature is charged with implementing an

unclear constitutional provision, the Legislature's interpretation of the measure deserves great deference." (*Birkett, supra*, 21 Cal.4th at p. 244, citing *Amador Valley, supra*, 22 Cal.3d at pp. 245–246; *California Housing Finance Agency v. Patitucci* (1978) 22 Cal.3d 171, 175 [148 Cal.Rptr. 875, 583 P.2d 729]; cf. *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1253 [48 Cal.Rptr.2d 12, 906 P.2d 1112].) When the Legislature has "adopted a plausible interpretation of the constitutional provision," we defer to its determination. (*Birkett, supra*, 21 Cal.4th at p. 244.)

▮ The Legislature has enacted a statutory scheme that implements the broad mandate of California Constitution, article I, section 28, subdivision (b). Penal Code section 1202.4 begins: "It is the intent of the Legislature that a victim of a crime who incurs *any economic loss* as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." (*Id.*, subd. (a)(1), italics added.) It requires also that the restitution order "shall be of a dollar amount that is sufficient to *fully* reimburse the victim or victims for *every* determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (*Id.*, subd. (f)(3), italics added.) Additionally, "[t]he court shall order *full restitution* unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record." (*Id.*, subd. (g), italics added.)

▮ The Legislature has supplied one limitation to the scope of losses that must be included in a restitution order that is not expressly included in California Constitution, article I, section 28, subdivision (b). That is, it has limited restitution orders primarily to "*economic* loss[es]." (Pen. Code, § 1202.4, subds. (a), (f), italics added.) With the exception of restitution orders relating to felony convictions for lewd or lascivious acts (Pen. Code, § 288), for which noneconomic losses may be included in a direct restitution order, Penal Code section 1202.4 does not authorize direct restitution for noneconomic losses. (*Id.*, subd. (f).) Apart from this categorical limitation, the Legislature has not further limited the types of economic loss that must be included in a restitution order. Since its amendment in 1996, the list of categories of compensable loss in Penal Code section 1202.4 has been nonexclusive: the order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for *every determined economic loss* incurred as the result of the defendant's criminal conduct, *including, but not limited to*," the 11 enumerated categories discussed above. (Pen. Code, § 1202.4, subd. (f)(3), italics added.)

▮ Although defendant agrees that Patricia Armstrong may recover restitution pursuant to Penal Code section 1202.4, he argues that she is only a "derivative victim," not an "actual victim." Penal Code section 1202.4, however, makes no such distinction. Instead, a "victim" is defined to include

"[t]he immediate surviving family of the actual victim" and "[a]ny person who has sustained economic loss as the result of a crime and who . . . [¶] [a]t the time of the crime was the parent, grandparent, sibling, spouse, child, or grandchild of the victim." (Pen. Code, § 1202.4, subd. (k)(1), (3)(A).) A "victim" also may be "[a]ny person who is eligible to receive assistance from the Restitution Fund." (*Id.*, subd. (k)(4).) Persons who are eligible to receive assistance from the Restitution Fund include "derivative victim[s]" (Gov. Code, § 13955, subd. (a)(2)), who are defined as "individual[s] who sustain[] pecuniary loss as a result of injury or death to a victim." (Gov. Code, § 13951, subd. (c).) While the Restitution Fund thus separately defines a "derivative victim," Penal Code section 1202.4 does not.

■ Defendant argues that, despite the broad language of California Constitution, article I, section 28, subdivision (b) and Penal Code section 1202.4, Patricia Armstrong may not recover the future earnings of her deceased spouse. We agree with defendant that Patricia Armstrong does not step into the shoes of decedent to recover his future losses. The language of article I, section 28, subdivision (b) of the California Constitution, itself suggests that victims may recover restitution only for those losses suffered personally: "all *persons who suffer losses* as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes *for losses they suffer.*" (Italics added.) Moreover, Penal Code section 1202.4 does not provide that a surviving spouse, or other family member or heir, may recover losses on behalf of a deceased victim. Instead, it provides only that a victim may recover economic losses that he or she incurred personally: "a victim of crime *who incurs* any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." (*Id.*, subd. (a), italics added.)

We disagree, however, with defendant's argument that Patricia Armstrong did not suffer an economic loss that must be included in a direct restitution order. Defendant first argues that the Legislature has not authorized restitution for prospective economic losses. He points out the use of the word "reimburse" in Penal Code section 1202.4's requirement that a restitution order "shall be of a dollar amount that is sufficient to fully *reimburse* the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." (*Id.*, subd. (f)(3), italics added.) He contends that the word "reimburse" indicates that the Legislature intended only for restitution to be paid for "back costs, expenses, and wages *previously* lost as a result of the offense." This interpretation is too narrow, and it conflicts with the plain meaning and purpose of the statute.

■ Many, if not all, of the categories of loss compensable as direct restitution include losses that are incurred after the occurrence of the crime,

and which may continue to be incurred for a substantial period of time following a restitution hearing. (Pen. Code, § 1202.4, subd. (f)(3).) For example, "[w]ages or profits lost due to injury incurred by the victim," necessarily arise following the occurrence of the crime, and it is likely that many injured crime victims will lose wages or profits for weeks, months, or possibly years following a restitution hearing. (*Id.*, subd. (f)(3)(D).) Also, "[m]edical expenses" or "[m]ental health counseling expenses" may be incurred after a restitution hearing is held. (*Id.*, subd. (f)(3)(B), (C).) As the Court of Appeal reasoned in *People v. Phelps* (1996) 41 Cal.App.4th 946, 950 [48 Cal.Rptr.2d 855], when determining that medical expenses paid after a sentencing hearing may be included in a restitution order, "[n]othing in the language of the Constitution suggests an intent to limit the right to restitution for financial losses occurring within a particular time frame, or restitution to expenses incurred before sentencing." Construing the word "loss" broadly, the Court of Appeal found "that it refers to a victim's injuries, requiring restitution for all expenses necessary to treat those injuries, regardless of when they arise." (*Ibid.*) We agree. As we have observed in the context of the unfair competition law, "[t]he object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1149 [131 Cal.Rptr.2d 29, 63 P.3d 937].) The object is the same when restitution is imposed following a criminal conviction. In order to restore the economic status quo, to the extent that it is possible when a criminal act has injured a victim, restitution orders must not be limited to the amount of money that has been paid or lost prior to the restitution hearing.

Defendant next argues that Patricia Armstrong did not personally suffer an economic loss. We disagree. In civil wrongful death actions, it is well established that a surviving spouse incurs an economic loss upon the death of his or her spouse. (See, e.g., *Gilmore v. Los Angeles Ry. Corp.* (1930) 211 Cal. 192, 197–198 [295 P. 41]; *Syah v. Johnson* (1966) 247 Cal.App.2d 534, 546–547 [55 Cal.Rptr. 741].) The purpose of the statute establishing standing for certain persons to bring wrongful death actions, Code of Civil Procedure section 377.60, "is to enable the heirs and certain specified dependents of a person wrongfully killed to recover compensation for the *economic loss* and deprivation of consortium they suffer as a result of the death." (*Justus v. Atchison* (1977) 19 Cal.3d 564, 581 [139 Cal.Rptr. 97, 565 P.2d 122] (*Justus*), italics added, disapproved on another ground in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171 [216 Cal.Rptr. 661, 703 P.2d 1].) One of the approved jury instructions for calculating wrongful death losses describes the "financial support, if any, which each of said heirs would have received from the deceased except for the death, and the right to receive support, if any, which each of the heirs has lost by reason of the death" as "economic damage." (BAJI No. 14.50; see also Judicial Council of Cal. Civ. Jury Instns.

(Feb. 2007 rev.) CACI No. 3921.) As we discuss in more detail below, the economic loss incurred by a surviving spouse is the loss of future economic support due to the spouse's death. (*Canavin v. Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 520–521 [196 Cal.Rptr. 82] (*Canavin*).)

Defendant argues that wrongful death claims are purely statutory and that the Legislature has not demonstrated an intent to expand wrongful death recovery through the restitution scheme. Defendant is correct that it is has been widely understood that a decedent's heirs were without remedy for the decedent's death at common law. Shortly after this state's first wrongful death statute was enacted in 1862, this court observed "[t]hat a civil action for the death of a person, *per se*, cannot be maintained by any one at common law is too well settled to admit of discussion at the present time." (*Kramer v. Market Street Railroad Company* (1864) 25 Cal. 434, 435.) Although some doubt has been cast on the understanding that common law did not provide a cause of action for wrongful death, the Legislature acted upon this widely held belief when it enacted the state's first wrongful death statute. (*Justus, supra*, 19 Cal.3d at pp. 573–574, citing *Moragne v. States Marine Lines* (1970) 398 U.S. 375 [26 L.Ed.2d 339, 90 S.Ct. 1772].) We have therefore concluded that the Legislature's "intent in adopting the 1862 statute, and its successor [Code of Civil Procedure] section 377, was manifestly to create an entirely new cause of action where none was thought to exist before." (*Justus, supra*, 19 Cal.3d at p. 574.) We have been "persuaded that the Legislature intends to occupy the field of recovery for wrongful death," and, accordingly, wrongful death "remains a creature of statute in California." (*Id.* at p. 575.)

That the Legislature's wrongful death statute provides standing only for certain people to bring civil claims for wrongful death, however, does not demonstrate that the Legislature excluded support losses from restitution orders. The Legislature very clearly intended "that a victim of crime who incurs *any economic loss* as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." (Pen. Code, § 1202.4, subd. (a)(1), italics added.) The Legislature is presumed to be aware of " 'judicial decisions already in existence, and to have enacted or amended a statute in light thereof. [Citation.]' " (*People v. Yartz* (2005) 37 Cal.4th 529, 538 [36 Cal.Rptr.3d 328, 123 P.3d 604].) Accordingly, when it enacted Penal Code 1202.4, requiring that victims receive restitution for all economic losses, it did so with the presumed knowledge that courts have long understood that a surviving spouse incurs an economic loss upon the death of his or her spouse.

Defendant also suggests that because the Legislature has expressly permitted awards to derivative victims from the Restitution Fund for loss of

support,[5] but has not specifically provided that direct restitution orders include such awards, the Legislature did not intend direct restitution orders to include awards for loss of support. Given the constitutional and legislative intent to provide restitution for all crime victim losses, and the expressly nonexclusive list of categories of loss included in the direct restitution statute, we decline to read into that statute an implied limitation on restitution to surviving spouses based on a failure to enumerate that type of loss explicitly.

We are also not persuaded by defendant's argument that the doctrine of *ejusdem generis* limits the categories of loss that may be compensable by a direct restitution order. The doctrine of *ejusdem generis* provides "that if the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples peculiar things or classes of things since those descriptions then would be surplusage." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 141 [96 Cal.Rptr.2d 485, 999 P.2d 718].) "*Ejusdem generis* applies whether specific words follow general words in a statute or vice versa. In either event, the general term or category is 'restricted to those things that are similar to those which are enumerated specifically.' " (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160, fn. 7 [278 Cal.Rptr. 614, 805 P.2d 873], quoting *Martin v. Holiday Inns, Inc.* (1988) 199 Cal.App.3d 1434, 1437 [245 Cal.Rptr. 717].) Although "the phrase 'including, but not limited to' is a phrase of enlargement," the use of this phrase does not conclusively demonstrate that the Legislature intended a category to be without limits. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389 [241 Cal.Rptr. 67, 743 P.2d 1323] (*Dyna-Med*).) In *Dyna-Med*, we held that, despite the phrase "including, but not limited to," the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) does not authorize the Fair Employment and Housing Commission to award punitive damages, because punitive damages are different in kind from the corrective and equitable remedies provided. (*Dyna-Med*, at pp. 1387–1389.)

Unlike the difference in kind between punitive damages and corrective and equitable remedies at issue in *Dyna-Med*, a spouse's loss of support *is* similar to the categories of loss that are enumerated in Penal Code section 1202.4, subdivision (f). Broadly, the loss of support incurred by a spouse is,

---

[5] "[A] derivative victim who was legally dependent on the victim at the time of the crime" may be compensated by the Restitution Fund "for the loss of support incurred by that person as a direct result of the crime, subject to both of the following: [¶] (A) Loss of support shall be paid by the board for income lost by an adult for a period up to, but not more than, five years following the date of the crime. [¶] (B) Loss of support shall not be paid by the board on behalf of a minor for a period beyond the child's attaining the age of 18 years." (Gov. Code, § 13957.5, subd. (a)(4).) "The total amount payable to all derivative victims pursuant to this section as the result of one crime may not exceed seventy thousand dollars ($70,000)." (*Id.*, subd. (b).)

like the enumerated categories of loss, an economic loss incurred as the result of a criminal act. More specifically, it is akin to the categories of loss that require restitution for "[w]ages or profits lost" due to injury, time spent as a witness, or time spent assisting the police or prosecution. (Pen. Code, § 1202.4, subd. (f)(3)(D), (E).) Like a victim who loses wages or other income, upon the death of a spouse a surviving spouse loses the economic support that he or she otherwise would have received.

Defendant attempts to distinguish the losses designated in Penal Code section 1202.4, subdivision (f), from a surviving spouse's economic loss, suggesting that "the nature of the enumerated items is consistent—all losses are immediate, concrete, and easily ascertainable; none are remote, speculative, anticipatory, conjectural, or particularly complex." We disagree. As discussed above, several types of loss require anticipation of the exact amount of economic loss that will be incurred. Additionally, several enumerated categories of loss may require complicated calculations or result in large restitution awards. For example, in *People v. Thygesen* (1999) 69 Cal.App.4th 988, 995 [81 Cal.Rptr.2d 886], the Court of Appeal held that the trial court had not properly calculated the loss attributable to the theft of a cement mixer from an equipment rental business, observing, "Determination of loss of use necessarily involves evidence as to . . . several factors. Initially, the trial court will have to determine the length of time it took (or reasonably should have taken) the victim to replace the stolen item. Next, the court will multiply the days lost by a reasonable rental rate. In computing what is reasonable, evidence will have to be supplied as to how often the item was rented and the annual (or monthly/daily) income it has historically produced." In *People v. Baumann* (1985) 176 Cal.App.3d 67, 74 [222 Cal.Rptr. 32] (*Baumann*), the trial court held "[a] lengthy hearing as to the exact extent of the victim's loss" attributable to defendant's embezzlement, during which several witnesses testified and 75 checks were introduced into evidence, and "the court found the evidence substantiated a loss to the victim of $20,419." Accordingly, while calculation of a spouse's loss of support may be complex, as is described in more detail below, this complexity does not materially distinguish it from the categories of loss specified by the Legislature.

As defendant points out, California Constitution, article I, section 28, subdivision (b) allows that restitution need not be imposed if "compelling and extraordinary reasons exist to the contrary." Following the mandate of article I, section 28, subdivision (b), the Legislature has provided in Penal Code section 1202.4 that a court need not impose restitution if "it finds compelling and extraordinary reasons for not doing so, and states [the reasons] on the record." (Pen. Code, § 1202.4, subd. (f); see *id.*, subd. (g).) While this exception indicates that the voters and the Legislature contemplated there would be circumstances in which restitution would not be ordered, it does not support concluding that a surviving spouse's lost economic support may not

be included in a restitution order. Without speculating as to reasons that might qualify as "compelling and extraordinary," we observe only that this exception does not exclude entire categories of loss. Rather, it allows a trial court some discretion to decline to impose restitution in unusual situations specific to a particular crime, defendant, or other circumstance.

Finally, defendant argues that there are numerous policy considerations that might have caused the Legislature not to include a surviving spouse's lost economic support as restitution. Namely, that "[s]entencing hearings would devolve into civil trials"; that the "[p]ublic fisc would be funding personal injury defense"; that allowing a spouse to recover for losses incurred following his or her spouse's death would implicate due process concerns;[6] that a defendant's right to equal protection of the law would be implicated if a victim could receive more in restitution through a direct restitution order than from the Restitution Fund; and that "[a] defendant is generally reluctant to challenge restitution, for fear any challenge, no matter how factually or legally legitimate, would create animus and thereby negatively impact sentencing, particularly where there is a death involved." The Legislature did not, however, exclude a surviving spouse's lost economic support from restitution orders, and it is not for us to judge the wisdom of the Legislature's policy decisions. Accordingly, we do not address these policy considerations.

■ For the foregoing reasons, we hold that a surviving spouse may receive as direct restitution the amount of lost economic support incurred due to a criminal act that resulted in the death of his or her spouse.

---

[6] As defendant acknowledges, numerous courts have held that restitution hearings require fewer due process protections than civil hearings or criminal hearings of guilt. (See, e.g., *Baumann, supra,* 176 Cal.App.3d at pp. 79–81; *People v. Rivera* (1989) 212 Cal.App.3d 1153, 1160–1161 [261 Cal.Rptr. 93]; *People v. Cain* (2000) 82 Cal.App.4th 81, 86 [97 Cal.Rptr.2d 836].) Courts have premised this conclusion on the understanding that restitution hearings are sentencing hearings. (*Baumann, supra,* 176 Cal.App.3d at pp. 80–81; *Rivera, supra,* 212 Cal.App.3d at pp. 1160–1161, citing *Baumann, supra,* 176 Cal.App.3d at pp. 80–81; *Cain, supra,* 82 Cal.App.4th at p. 86; cf. *People v. Harvest* (2000) 84 Cal.App.4th 641, 647 [101 Cal.Rptr.2d 135] (*Harvest*).) These cases were decided prior to the high court's decision in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], and our decisions in *People v. Black* (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130] and *People v. Sandoval* (2007) 41 Cal.4th 825 [62 Cal.Rptr.3d 588, 161 P.3d 1146], which required "that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." (*Cunningham v. California, supra,* 549 U.S. at p. 281 [127 S.Ct. at pp. 863–864]; see *People v. Black, supra,* 41 Cal.4th at p. 809; *People v. Sandoval, supra,* 41 Cal.4th at p. 835.) Because defendant has not raised any due process or other state or federal constitutional challenge, however, we do not have occasion to address possible constitutional challenges to restitution hearings.

## C.

We next consider how a trial court should measure a surviving victim's economic loss. As discussed, Patricia Armstrong requested restitution "in the amount of a very modest life insurance policy in the amount of $25,000 to $50,000, based on the decedent's modest earnings of approximately $35,000 per year." The trial court heard testimony by decedent's employer establishing decedent's earnings for the three years preceding his death and by Patricia Armstrong that decedent "was a provider" for their family. Based on this testimony, the court ordered defendant to pay restitution to Patricia Armstrong in the amount of $167,711.65, which was calculated by multiplying decedent's approximate average annual earnings over the three years prior to his death by five years. Defendant appeals the amount of restitution ordered by the trial court and affirmed by the Court of Appeal, arguing that the trial court improperly calculated Patricia Armstrong's loss. As we will explain, although we agree that the trial court's calculation was imprecise, we are not persuaded that the trial court abused its discretion.

As both parties agree, we review the trial court's restitution order for abuse of discretion. (See, e.g., *People v. Maheshwari* (2003) 107 Cal.App.4th 1406, 1409 [132 Cal.Rptr.2d 903]; *People v. Hove* (1999) 76 Cal.App.4th 1266, 1275 [91 Cal.Rptr.2d 128]; *People v. Draut* (1999) 73 Cal.App.4th 577, 581–582 [86 Cal.Rptr.2d 469].)[7] The abuse of discretion standard is "deferential," but it "is not empty." (*People v. Williams* (1998) 17 Cal.4th 148, 162 [69 Cal.Rptr.2d 917, 948 P.2d 429].) "[I]t asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*Ibid.*) Under this standard, while a trial court has broad discretion to choose a method for calculating the amount of restitution, it must employ a method that is rationally designed to determine the

[7] While we review all restitution orders for abuse of discretion, we note that the scope of a trial court's discretion is broader when restitution is imposed as a condition of probation. Penal Code section 1203.1, subdivision (j) expressly grants trial courts broad discretion in imposing conditions of probation. As this court has held, "[a] condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .' " (*Lent, supra,* 15 Cal.3d at p. 486.) With respect to the third criterion, "an order for restitution, i.e., attempting to make a victim whole, has generally been deemed a deterrent to future criminality [citation], and the court is not limited to the transactions or amounts of which defendant is actually convicted [citations]." (*Ibid.*) Probationary restitution may be imposed even if a defendant has not been convicted for a particular offense "because probation is an ' " 'act of clemency and grace,' " ' not a matter of right. [Citation.] '[T]he granting of probation is not a right but a privilege, and if the defendant feels that the terms of probation are harsher than the sentence for the substantive offense[,] he is free to refuse probation.' [Citations.] Because a defendant has no right to probation, the trial court can impose probation conditions that it could not otherwise impose, so long as the conditions are not invalid under the three *Lent* criteria." (*People v. Rubics* (2006) 136 Cal.App.4th 452, 459–460 [38 Cal.Rptr.3d 886].)

surviving victim's economic loss. To facilitate appellate review of the trial court's restitution order, the trial court must take care to make a record of the restitution hearing, analyze the evidence presented, and make a clear statement of the calculation method used and how that method justifies the amount ordered.

 Defendant first suggests that the amount of restitution a surviving spouse may receive as direct restitution pursuant to Penal Code section 1202.4 is limited to the amount of loss of support assistance offered by the Restitution Fund. We disagree. Derivative victims may recover loss of support from the Restitution Fund for a maximum period of five years, or for a minor until the age of 18 years, and for a total amount of no more than $70,000 for losses suffered by all derivative victims due to one crime. (Gov. Code, § 13957.5, subds. (a)(4), (b).) There is no reason to import into Penal Code section 1202.4 these restrictions governing Restitution Fund payments for loss of support. The provision restricting Restitution Fund payments for loss of support does not purport to define the surviving spouse or family member's economic loss. (Gov. Code, § 13957.5, subds. (a)(4), (b).) Moreover, the Restitution Fund is not intended, as direct restitution orders are, "to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (Pen. Code, § 1202.4, subd. (f)(3).) Instead, the purpose of the Restitution Fund is "to assist residents of the State of California in obtaining compensation for the pecuniary losses they suffer as a direct result of criminal acts." (Gov. Code, § 13950, subd. (a).)

 Defendant next argues that the trial court's calculation was erroneous because it did not accurately compensate Patricia Armstrong for her own economic loss. We agree that a surviving spouse's economic loss is not simply the wages or income that the deceased spouse would have earned but for his or her death. As discussed above, Penal Code section 1202.4 does not provide that a surviving spouse, or other family member or heir, steps into the shoes of decedent in order to recover the decedent's losses. (Pen. Code, § 1202.4, subd. (a)(1) ["[A] victim of crime *who incurs* any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime" (italics added)].) Instead, a surviving spouse may receive restitution only in the amount of his or her own economic loss.

 Penal Code section 1202.4 does not itself provide guidelines for calculating the economic loss that a surviving spouse incurs. However, as stated above, a trial court must demonstrate a rational basis for its award, and ensure that the record is sufficient to permit meaningful review. The burden is on the party seeking restitution to provide an adequate factual basis for the claim.

In concluding that a surviving spouse may receive as direct restitution the economic loss attributable to a criminal act that resulted in the death of his or her spouse, looking to wrongful death case law enabled us to see the surviving spouse's economic loss as a common category of economic loss. This case law is also useful in demonstrating that the surviving spouse's economic loss is best described as a loss of economic *support*. The purpose of a wrongful death judgment is "to provide the amounts of *future support* which the beneficiaries would have received in the future had decedent lived" (*Canavin, supra,* 148 Cal.App.3d at p. 521, italics added), and "[w]here, as here, decedent was a husband and father, a significant element of damages is the loss of financial benefits he was contributing to his family by way of *support* at the time of his death and that *support* reasonably expected in the future." (*Id.* at pp. 520–521, italics added.) Additionally, the jury instructions for calculating wrongful death damages, which address both economic and noneconomic damages, describe as "economic loss" the "financial *support,*" that the decedent would have contributed to the surviving heir or family member. (BAJI No. 14.50, italics added; CACI No. 3921.)

In a criminal case an award of restitution is committed to the sound discretion of the trial court. No abuse of that discretion occurs as long as the determination of economic loss is reasonable, producing a nonarbitrary result. Factors relevant to that determination will necessarily depend on the particular circumstances before the court. Generally, the calculation of the loss of support may be informed by such factors as the earning history of the deceased spouse, the age of the survivor and decedent, and the degree to which the decedent's income provided support to the survivor's household. These guideposts are not provided as an exhaustive list. Naturally the court's discretion will be guided by the particular factors at play in each individual claim.

In the instant case, the trial court ordered restitution in the amount of $167,711.65. It estimated Patricia Armstrong's loss by multiplying the deceased victim's approximate average annual earnings by five years. This method of calculation assumes that Patricia Armstrong was entitled to receive her husband's gross annual earnings, not just that portion of his earnings that went to her economic support. It also assumes that five years is the appropriate term for loss of support restitution. The trial court's only apparent basis for choosing a period of five years was *Harvest, supra,* 84 Cal.App.4th at page 653, a case in which a trial court ordered the defendant to pay $23,160 to the former wife of a deceased victim for the loss of child support decedent

had been ordered to pay.[8] In these ways, the trial court's method of calculation was not carefully designed to establish Patricia Armstrong's loss of support.

Despite the trial court's methodological imprecision, defendant has not shown that the amount of restitution ordered was an abuse of the trial court's discretion. On appeal, we presume that a judgment or order of the trial court is correct, " '[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) Defendant suggests that, if the court does not limit restitution to the amount permitted by the Restitution Fund, we should limit it to "the amount of the surviving spouse's demonstrated loss of support." While we agree with this general principle, defendant has not shown that Patricia Armstrong's loss of support was less than the amount of restitution ordered.

Defendant argues only that the trial court ordered restitution in excess of Patricia Armstrong's loss on the ground that the court did not take into consideration what portion of decedent's income would have gone to support himself or others. Defendant does not address the period of time for which Patricia Armstrong would have received economic support from her husband but for his death. The trial court awarded restitution based on a period of five years, but, as defendant's counsel indicated, decedent was relatively young when he was killed and the court could have calculated loss of support using a longer period of time.[9] Accordingly, defendant has not shown that a method designed to approximate Patricia Armstrong's loss of economic support, taking into consideration the deceased victim's anticipated years of contribution to his wife's support, would have resulted in an amount of restitution less than $167,711.65.

---

[8] The trial court in this case explained that the "restitution order is based upon the lost wages to the household in the average amount of $33,542.33 multiplied by a period of five years as was the 60 months in the *People v. Harvest* case." The use of five years seems to have been arbitrary in *Harvest*. There, restitution was not imposed until after the defendant's conviction was affirmed on appeal. (*Harvest, supra,* 84 Cal.App.4th at p. 645.) The period of five years was based on the period between an unspecified triggering event and the date that the restitution order was entered. (*Id.* at pp. 652–653.) In *Harvest*, the dissent criticized the trial court's calculation of child support losses, observing: "The trial court calculated the loss of child support from July 1994 to the month of its order, July 1999, or a period of 60 months at $386 per month yielding a total of $23,160. Had defendant been promptly given a restitution hearing—say in March or April of 1995—the amount of restitution for child support would literally have been in the range of $3,000 rather than $23,000." (*Id.* at p. 658 (dis. opn. of Poché, J.).)

[9] During oral argument, defendant's counsel said that she believed that decedent was in his 30's at the time he was killed.

Penal Code section 1202.4, subdivision (f) requires that restitution be "based on the amount of loss claimed by the victim or victims or any other showing to the court," and here Patricia Armstrong requested restitution only "in the amount of a very modest life insurance policy in the amount of $25,000 to $50,000." The trial court ordered restitution in an amount that more than satisfied Patricia Armstrong's claim, and defendant has not shown that this amount exceeds that which she was eligible to receive. Accordingly, we have not been persuaded that the trial court abused its discretion.

## III. CONCLUSION

For the reasons stated above, we affirm the judgment of the Court of Appeal.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**KENNARD, J.,** Dissenting.—The majority holds that in a *criminal* proceeding the sentencing court may order a defendant who has been convicted of a homicide crime to pay the deceased victim's surviving spouse, as restitution, a portion of the estimated income that the deceased victim would likely have earned. In the tragic circumstances of this case, that holding is certainly appealing. But the Legislature has established other methods by which a surviving spouse may obtain restitution for loss of economic support resulting from a homicide victim's death—the surviving spouse may bring a civil wrongful death action (Code Civ. Proc., § 377.60) against the defendant or apply to the state Restitution Fund established for crime victims (Gov. Code, § 13950 et seq.). A close review of the pertinent legislative scheme reveals several reasons to doubt that the Legislature has, in addition to these two clearly established methods for obtaining restitution for lost support, also authorized sentencing courts to include this category of loss in a direct restitution order. It seems more likely that the Legislature reasonably decided that the criminal sentencing process is ill suited to making the often exceptionally complex damage calculations that are required.

### I

In December 2003, while under the influence of alcohol, defendant Charles Giordano killed Kenneth Armstrong when defendant's car collided with Armstrong's motorcycle. Defendant pled guilty to vehicular manslaughter (Pen. Code, former § 192, subd. (c)(3), as amended by Stats. 1998, ch. 278, § 1) and admitted a prior conviction for driving under the influence (Veh. Code, § 23152, subd. (b)). The trial court sentenced him to a four-year prison term.

In May 2004, Patricia Armstrong, the surviving spouse of victim Kenneth Armstrong, requested a hearing on victim restitution. The trial court in the criminal proceeding held a hearing in July 2004 at which Patricia and her deceased husband's former employer were the only witnesses. The employer, a roofing contractor, testified that Kenneth Armstrong had worked for him as a foreman with annual earnings, during the three years before his death, of $38,940, $29,131, and $32,546. Patricia testified that she and Kenneth had been married for eight years and that Kenneth had been the main provider for their family, although during the last two years she had also been employed. The trial court ordered defendant to pay restitution to Patricia in the amount of $167,711, which was five times Kenneth's average annual earnings during the three years before his death.

On appeal, defendant argued that the Legislature had not authorized trial courts in criminal proceedings to make restitution orders for the projected future earnings of a deceased victim. The Court of Appeal rejected the argument and affirmed the restitution order.

## II

Our state Constitution requires trial courts in criminal proceedings to make victim restitution orders. As relevant here, it provides: "Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary." (Cal. Const., art. I, § 28, subd. (b).) It requires the Legislature to "adopt provisions to implement this section." (*Ibid.*)

In response, the Legislature enacted Penal Code section 1202.4 (section 1202.4). The provision at issue here is subdivision (f), which states that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims." Section 1202.4 defines "victim" as including "[t]he immediate surviving family of the actual victim" and "[a]ny person who has sustained economic loss as the result of a crime and who . . . [¶] . . . [a]t the time of the crime was the . . . spouse . . . of the victim." (§ 1202.4, subd. (k).) Under this definition, Patricia Armstrong is a victim of defendant's vehicular manslaughter crime and may recover restitution. The issue is whether, under section 1202.4, the trial court in the criminal proceeding may make a direct restitution order for the estimated amount of her deceased husband's lost future income.

Section 1202.4 states that "[t]o the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or

victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).) Section 1202.4 then provides a nonexclusive list of 11 forms of economic losses that may be compensated by a direct restitution order. Of particular relevance here, the list includes "[w]ages or profits lost due to injury incurred by the victim, and if the victim is a minor, wages or profits lost by the minor's parent, parents, guardian, or guardians, while caring for the injured minor" and "[w]ages or profits lost by the victim, and if the victim is a minor, wages or profits lost by the minor's parent, parents, guardian, or guardians, due to time spent as a witness or in assisting the police or prosecution." (§ 1202.4, subd. (f)(3)(D), (E).)

Thus, the Legislature has specified two categories of lost wages that may be included in a direct restitution order in a criminal case: wages lost "due to injury incurred by the victim," and wages lost "due to time spent as a witness or in assisting the police or prosecution." (§ 1202.4, subd. (f)(3)(D), (E).) *Neither category covers a surviving spouse's claim for estimated lost future wages of a deceased victim.* Although the list of categories is not exclusive, it is strong evidence of the sorts of losses the Legislature has decided to authorize for inclusion in direct restitution orders. When a statute contains a nonexhaustive list of categories, it is reasonable to infer that the Legislature intended to limit the provision to things essentially similar to those expressly listed, because if no such limitation was intended the list would be surplusage. (*International Federation of Professional and Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342 [64 Cal.Rptr.3d 693, 165 P.3d 488]; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 141 [96 Cal.Rptr.2d 485, 999 P.2d 718]; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1390–1391 [241 Cal.Rptr. 67, 743 P.2d 1323].) The lost wages claim at issue here (the claim of a surviving spouse for a deceased spouse's projected future earnings) is not essentially similar to the two categories of lost wage claims that the Legislature has authorized. In each of those situations, the wages lost are those that the claimant victim would have earned; in neither situation are lost wages payable to a claimant other than the person whose wages were lost.

As the majority recognizes (maj. opn., *ante,* at pp. 649, 658–659), the loss for which the surviving spouse here seeks compensation is more correctly characterized as a loss of economic support rather than a wage loss. It is the loss of that portion of the deceased victim's projected future income that he likely would have provided to the claimant widow. None of the 11 categories listed in subdivision (f)(3) of section 1202.4 is a loss of anticipated future economic support. The most reasonable inference to draw from the omission of anticipated economic support losses from the statutory list is that the Legislature did not intend to authorize criminal sentencing courts to order direct restitution for this category of loss.

That inference is strengthened when one compares section 1202.4's direct restitution provisions with the parallel provisions governing crime victim recovery from the Restitution Fund (Gov. Code, § 13950 et seq.). For purposes of recovery from the Restitution Fund, a homicide victim's surviving spouse is considered a " 'derivative victim' " (*id.*, § 13951, subd. (c)) and may obtain compensation for "loss of support . . . [incurred] as a direct result of . . . the victim's death" (*id.*, § 13957, subd. (a)(4)) up to a maximum of $70,000 (*id.,* § 13957.5, subd. (b)). These provisions demonstrate that the Legislature was aware that homicide crimes cause surviving spouses to suffer a loss of economic support, and that it chose to provide compensation for this category of loss through the Restitution Fund. Because the Legislature has amended the Government Code's Restitution Fund provisions and the Penal Code's direct restitution order provisions simultaneously (e.g., Stats. 2000, ch. 1016) and has tied them together (§ 1202.4, subd. (f)(4)), it is reasonable to infer that the Legislature consciously decided to authorize compensation for loss of economic support through the Restitution Fund *but not through direct restitution orders*. (See *Peñasquitos, Inc. v. Superior Court* (1991) 53 Cal.3d 1180, 1188–1189 [283 Cal.Rptr. 135, 812 P.2d 154] [" ' "Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." ' "].)

Why might the Legislature have decided not to authorize direct restitution orders for loss of economic support resulting from a homicide crime? The Legislature was no doubt keenly aware of the devastation that homicide crimes inflict on surviving family members, and no doubt the Legislature intended that a surviving spouse have convenient and effective legal remedies against the killer for resulting economic losses, including loss of economic support. The Legislature has provided one remedy through the Restitution Fund. If the surviving spouse receives compensation in that way, the defendant must reimburse the Restitution Fund in the amount paid to the surviving spouse (Pen. Code, § 1202.4, subd. (f)(4)), thus ensuring that the criminal defendant is ultimately held financially liable for the surviving spouse's loss of economic support.

Alternatively, the surviving spouse may bring a civil wrongful death action (Code Civ. Proc., § 377.60) against the defendant to obtain full compensation for the loss of economic support resulting from the victim's death. For a civil damage action against a defendant based on conduct that has resulted in the defendant's conviction of a felony offense, the Legislature has eased the claimant's burdens by waiving filing fees (Gov. Code, § 70611), giving those actions calendar preference (Code Civ. Proc., § 37), and allowing a prevailing plaintiff to recover attorney fees (*id.*, § 1021.4).

The Legislature may well have concluded, however, that sentencing proceedings are not a suitable forum to litigate loss-of-support issues, which are often exceptionally complex. (See, e.g., *Corder v. Corder* (2007) 41 Cal.4th 644, 660–667 [61 Cal.Rptr.3d 660].) As Judge Richard A. Posner of the Seventh Circuit United States Court of Appeals has observed, "[r]estitution as a criminal remedy becomes problematic" when it "includes compensation for earnings . . . that would have been received in the future" because "[c]ompensation for the loss of future earnings is quintessentially civil." (*United States v. Fountain* (7th Cir. 1985) 768 F.2d 790, 801.) The reason "is practical: the calculation of lost future earnings involves the difficult problem of translating an uncertain future stream of earnings into a present value," which is a problem that is not well suited "for solution in a summary proceeding ancillary to sentencing for a criminal offense." (*Id.* at pp. 801–802.)

Determining the value of lost economic support resulting from a spouse's death requires a determination of the life expectancy of the claimant surviving spouse (*Francis v. Sauve* (1963) 222 Cal.App.2d 102, 121 [34 Cal.Rptr. 754]), a determination of the probability that the decedent would have remained married to the claimant spouse (*Corder v. Corder, supra,* 41 Cal.4th at pp. 660–667), a determination of how many more years the decedent likely would have worked until retirement and what amount the decedent would have earned in each of those years (*United States v. Fountain, supra,* 768 F.2d at p. 802; see also *Emery v. Southern California Gas Co.* (1946) 72 Cal.App.2d 821, 826 [165 P.2d 695]), a determination of the amount of the decedent's earnings that would have been devoted to the claimant spouse's economic support (*Carr v. Pacific Tel. Co.* (1972) 26 Cal.App.3d 537, 545 [103 Cal.Rptr. 120]), and a determination of the correct discount rate by which to reduce the estimated future economic support to a current lump-sum value (*United States v. Fountain, supra,* at p. 802; *Tyson v. Romey* (1948) 88 Cal.App.2d 752, 758 [199 P.2d 721]). In civil wrongful death actions, expert testimony is commonly used to assist the trier of fact in making some of these determinations. (*Emery v. Southern California Gas Co., supra,* at p. 824.)

Had the Legislature intended to require our already overburdened criminal courts to resolve these complex and typically civil issues during sentencing hearings, or during restitution hearings held after sentencing, I would expect to find some evidence of this intent in the language of section 1202.4, and I would expect to find that the Legislature had provided the criminal courts with some guidance on how to obtain and pay for the expert assistance that likely will be required to make these complex calculations. Not finding in the language of section 1202.4 any evidence supporting such an intent, I conclude that the Legislature did not intend to impose on criminal courts the burden of making these difficult determinations in direct restitution hearings.

## III

Patricia Armstrong has a legal right—indeed a state constitutional right (Cal. Const., art. I, § 28, subd. (b))—to obtain restitution from defendant Giordano for the loss of economic support that is a direct result of her husband's death, for which defendant has pled guilty to vehicular manslaughter. In homicide cases the Legislature has established two methods by which a surviving spouse may enforce that restitution right and obtain compensation for loss of support from a defendant convicted of a homicide crime: The surviving spouse may bring a civil wrongful death action or, more simply and conveniently, may submit an application to the Restitution Fund. But I am unable to join my colleagues in concluding that the Legislature has authorized a third method—the direct restitution order—for enforcing a right to restitution for loss of support. I would reverse the Court of Appeal's judgment.